111 N.J. Super. 108 (1970)
267 A.2d 559
COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY, A CORPORATION, PLAINTIFF,
v.
JOHN APGAR, INDIVIDUALLY AND TRADING AS PARKWOOD COMPANY AND PARKWOOD COMPANY, A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided June 30, 1970.
*111 Mr. Samuel March, attorney for plaintiff.
Mr. Ralph N. Solodar, attorney for defendants.
HANDLER, J.S.C.
Plaintiff Commercial Insurance Company of Newark (Commercial) sues John Apgar, individually and trading as Parkwood Company (Apgar), and *112 Parkwood Company, a corporation (Parkwood). The action is for the wrongful and fraudulent conversion of insurance premiums paid by Seabrook Farms, Inc. (Seabrook) to defendants and not remitted to plaintiff. Defendants do not dispute that collected premiums are owed to Commercial. It is denied, however, that there was a conversion of the premiums involved and that Apgar rather than Parkwood was the insurance agent. They further assert that there is due a commission on the earned premiums.
In some respects this case is a sequel to Seabrook Farms, Inc. v. Commercial Insurance Co., 104 N.J. Super. 419 (Ch. Div. 1969). Many of the facts determined in that case are consistent with the facts here. Apgar was the principal stockholder and controlling officer of Parkwood, a licensed insurance brokerage company. Over the years he had been associated closely with Seabrook and other Seabrook interests as an employee and as an insurance advisor, representative, consultant and broker. Parkwood had been the broker of record on most of the insurance business involving the Seabrook interests. In the spring of 1966 it became necessary to consider the replacement of a comprehensive business insurance policy for Seabrook. Apgar dealt with Donald G. McAllister of Seabrook. He stated to McAllister that he was having difficulty obtaining insurance coverage and would require monies in advance to apply toward premiums in order to secure insurance on a binder. There were needed, he testified, a "good faith" or "good will" deposit because various prospective insurers expressed concern over the financial position of the Seabrook interests and the types of fire risks involved. As a result of Apgar's explanation, Seabrook on April 28, 1966 issued a check payable to Parkwood for $15,000 which was deposited by Apgar in Parkwood's account. Apgar subsequently told Seabrook that $15,000 was not enough and that the "insurance companies want another good will deposit," an additional $10,000. On June 2, 1966 Seabrook sent another check payable to Parkwood in the amount of $10,000 which was deposited *113 by Apgar in Parkwood's account. On or about June 3, 1966 Apgar contacted Appleton and Cox, the insurance representatives for the Continental Insurance Group of which Commercial was a member. A representative of Commercial toured the Seabrook properties with Apgar for the purpose of evaluating the risks. Shortly thereafter Commercial's representative advised Apgar that the risk would be accepted subject to underwriter's approval. Apgar did not at that time inform Commercial that he had already received from Seabrook, the prospective insured, a total of $25,000 as a deposit or advance against insurance premiums.
Commercial was described as an "agency company." Commercial was required by law to utilize an insurance agent in order to place and write insurance. On June 10, 1966 Commercial issued a temporary binder. On the same date Commercial designated Apgar, with the trade name Parkwood Company, as an authorized agent for Commercial by filing a certificate of appointment of agent with the New Jersey Commissioner of Banking and Insurance. On June 17, 1966 Commercial was advised by the Commissioner that the designation was improper because John Apgar was licensed as an individual and a corrected certificate of appointment was requested. Such a corrected certificate of appointment designating John Apgar as agent was then filed with the Commissioner on June 29, 1966. Apgar disclaimed any actual knowledge of the fact that he had been designated as an authorized agent for Commercial or that a certificate of his appointment as agent had been filed with the Commissioner. Nevertheless, in view of Apgar's own licensure and experience in the insurance field, he knew that Commercial was an "agency company" required to write insurance through a duly designated agent and that a certificate of appointment of an agent designated by Commercial was requisite for the writing of this policy.
A comprehensive business insurance policy for a three-year term was issued on December 5, 1966. Commercial *114 sent it by mail to Apgar and he delivered the policy to Seabrook on December 7, 1966, together with an invoice for $60,000 representing the total premiums for three years. A Seabrook check was drawn payable to Parkwood in the amount of $36,603. This included $35,000, which added to the total of $25,000 previously paid by Seabrook, constituted payment of all premiums due. Payment in full was receipted by Apgar.
Apgar and Parkwood failed to remit to Commercial any of the premiums collected from Seabrook and Commercial cancelled the insurance policy for nonpayment of premiums. Seabrook then instituted an action against Commercial for a declaratory judgment, contending that it had paid the full premium and that Commercial was not justified in cancelling the policy. Commercial counterclaimed for $25,000, the portion of the premiums paid by Seabrook as advances. In Seabrook Farms, Inc. v. Commercial Insurance Co., supra, it was held that Apgar and Parkwood were not the agents of Commercial when Seabrook paid its initial premium advances of $25,000 but were in fact at that time the brokers for Seabrook. As a consequence Seabrook had to bear the responsibility of any misappropriation on the part of Apgar or Parkwood with respect to these payments. It was ruled, therefore, that Seabrook was obligated to pay Commercial $25,000 and that Commercial was not entitled to cancel the policy.
With respect to the $35,000 received by Apgar and Parkwood on December 7, 1966, this occurred after Commercial designated Apgar its agent. Defendants do not therefore deny that there is owed to Commercial this sum representing the balance of the premiums collected (less commissions claimed by them), although Apgar disputes that he rather than Parkwood was the agent of Commercial.
Plaintiff's primary thesis is that defendants fraudulently converted the premiums due. The gravamen of the tort of conversion consists of the wrongful exercise of dominion and control over property owned by another in a manner *115 inconsistent with the owner's rights. McGlynn v. Schultz, 90 N.J. Super. 505 (Ch. Div. 1966), aff'd 95 N.J. Super. 412 (App. Div. 1967), certif. den. 50 N.J. 409 (1967); Prosser, Law of Torts (3rd ed. 1964), § 15, at 79. It is essential that the money converted by a tortfeasor must have belonged to the injured party. The tort is not limited, however, to cases where the defendant was obligated to deliver to the owner the identical property, coin, bank notes and the like which he had received. Pearl Assur. Co. v. National Ins. Agency, 151 Pa. Super. 146, 30 A.2d 333 (Super. Ct. 1943) (construing the Pennsylvania statute defining "fraudulent conversion"); Manufacturers' Cas. Ins. Co. v. Mink, 129 N.J.L. 575 (Sup. Ct. 1943).
In Seabrook Farms, Inc. v. Commercial Insurance Co., supra, 104 N.J. Super. at 423-424, it was observed that "[w]hen an insurer entrusts an insurance policy to an agent for the purpose of delivering the policy to and collecting the premiums from the insured, the insured's payment of such premiums to the agent is deemed payment to the insurer." A similar result obtains when the insured makes payment to an insurance broker (as distinguished from an insurance agent) to whom the carrier has entrusted the policy for delivery to the insured. Mt. Vernon Fire Ins. Co. v. Gillian, 95 N.J. Super. 279 (App. Div. 1967); Kubeck v. Concord Ins. Co., 103 N.J. Super. 525 (Ch. Div. 1968), aff'd 107 N.J. Super. 510 (App. Div. 1969). Thus, in terms of whether there was insurance coverage, as indicated in Seabrook Farms, Inc. v. Commercial Insurance Co., supra, Seabrook's payment of $35,000 to defendants was tantamount to its paying the money to Commercial itself. The more precise issue here, however, is whether such payment of premiums by an insured to an insurance agent constitutes those premiums the property of the insurer, not from the standpoint of effecting insurance but as a predicate for a tortious conversion.
It has been noted that the duty of an insurance agent "to act in a fiduciary capacity in aiding, soliciting, negotiating *116 and effecting contracts of insurance for companies, insureds and prospective insureds, N.J.S.A. 17:22-6.1, 17:22-6.2, necessitate[s] that they handle monies of other persons in a trustworthy manner." In re Comm'r of Banking and Insurance v. Parkwood Co., 98 N.J. Super. 263, 272 (App. Div. 1967). Emphasizing this duty, plaintiff contends that the premiums paid by an insured to an agent of the insurer may be considered the property of the insurer by virtue of an actual or implied trust relationship. Various cases are marshalled as authority for this proposition.
In Matter of Leterman v. Pink, 249 App. Div. 164, 291 N.Y.S. 249 (App. Div. 1936), aff'd sub nom. Ebenstein v. Pink, 275 N.Y. 613, 11 N.E.2d 781 (Ct. App. 1937), the court rejected the contention that there exists a custom among insurance brokers permitting them to commingle premiums collected from clients with their own general funds. The court adopted the view that "[t]he clear duty of any insurance agent is to keep separate and distinct, from his own property, specific premium payments received from a client and promptly to transmit to the insurance companies moneys thus collected." 291 N.Y.S. at 254. In Mid-States Ins. Co. v. American Fidelity & Cas Co., 234 F. 2d 721 (9 Cir.1956), it was decided at the trial level that the premiums received by the agent on behalf of the insurer were not trust funds since the agent was customarily allowed to use some of the collected premiums to pay his private agency expenses. This determination was reversed on the grounds that an earlier agency agreement which made no reference to a trust arrangement had been superseded by a later agreement with elaborate provisions that all premiums received by the agent should be held as trustee for the insurer. The court in Clay v. Eagle Reciprocal Exchange, 368 S.W.2d 344, 351 (Mo. Sup. Ct. 1963), applied a state law which provided that an insurance agent who "receives or collects money on any account whatsoever for any insurance company doing business in this state shall be responsible *117 in a trust or fiduciary capacity for any money so collected or received by him * * *." It was construed to apply not only to monies which the agent actually had received but also to monies which he ought to have collected. Cf. Twin City Fire Ins. Co. v. Green, 176 F.2d 532 (8 Cir.1949), reh. den. subject to modification, 177 F.2d 626 (8 Cir.1949).
Principal reliance is placed on Bohlinger v. Ward & Co., 34 N.J. Super. 583 (App. Div. 1955), aff'd 20 N.J. 331 (1956). There a New York insurance company had become insolvent and its statutory liquidator instituted suit against a New Jersey agent to recover premiums remaining due and unpaid to the company. The chief issue was whether the agent could offset against amounts owing to the company certain credits attributable to unearned premiums. Although the written agency agreement between plaintiff and defendant required the agent to pay promptly all collected premiums minus a deduction for specified commissions, the procedure customarily followed was for the agent to remit only the net amount of earned premiums due the company. Rejecting the view that a debtor-creditor relationship existed, the Appellate Division regarded the collected premiums as trust funds "to be received, held, and disbursed in a fiduciary capacity." 34 N.J. Super. at 588. The Supreme Court stressed that a contrary holding would unjustifiably give a preference to clients of this particular agent over all other creditors and policyholders of the insolvent carrier. Particular weight was placed on the fact that the agent, aware of the shaky financial condition of his principal, had actively sought to gain a priority for his own customers at the expense of other policyholders. Accordingly, the Supreme Court agreed with the Appellate Division that the premium monies already in possession of the agent should be treated as assets of the insurance company and be distributed pursuant to the law governing allocation of the remaining funds of an insolvent insurance company, without any bookkeeping credit for refunds due *118 on cancelled policies. Cf. Bohlinger v. Zanger, 306 N.Y. 228, 117, N.E.2d 338 (Ct. App. 1954), reh. den., 306 N.Y. 851, 118 N.E.2d 908 (Ct. App. 1954); Bohlinger v. Mayville Realty Co., 135 N.Y.S.2d 865 (Sup. Ct. 1954), aff'd 285 App. Div. 1045, 141 N.Y.S.2d 509 (App. Div. 1955), app. den. 309 N.Y. 1030, 129 N.E.2d 790 (Ct. App. 1955).
The legal principles which may be synthesized from these authorities disclose that courts are not hesitant in positing a trust with respect to premiums received by an agent on behalf of an insurer, if one or more factors are present. Frequently there is a written agency agreement establishing a trust (e.g., Mid-States Ins. Co. v. American Fidelity & Cas. Co. and Bohlinger v. Ward & Co., supra). There may be an operative statute which imposes a fiduciary relationship or expressly requires the segregation or strict accounting of all collected premiums (e.g., Clay v. Eagle Reciprocal Exchange, and Twin City Fire Ins. Co. v. Green, supra). Policy considerations involving the rights of third persons, such as creditors or other policyholders, may also be critical in determining the existence of a trust or as a basis for implying a fiduciary duty in the strict handling of collected premiums (e.g., Bohlinger v. Ward & Co. and Leterman v. Pink, supra).
The relationship between the parties herein bears none of the indicia of a trust with respect to premiums in the hands of an agent. Such a trust cannot be predicated on the basis of contract. There was no written agency contract, nor was there any evidence whatsoever as to an express oral agreement between the parties with respect to the handling of premiums. Established custom and usage may sometimes flesh out an otherwise ambiguous understanding of the parties. Ace Stone, Inc. v. Wayne Tp., 47 N.J. 431 (1966). Here the testimony was that there is no custom or usage within the insurance industry, in the absence of any specific written or oral understanding, which would import into the arrangements of the parties a requirement *119 that collected premiums be segregated or be treated as trust funds.
In some instances a course of dealing or conduct serves to explicate the practical understanding of the parties. Michaels v. Brookchester, Inc., 26 N.J. 379 (1958); Journeyman Barbers, etc., Local 687 v. Pollino, 22 N.J. 389 (1956). For example, in Hartford Accident & Indem. Co. v. Cooper Park Dev. Corp., 169 F.2d 803 (3 Cir.1948), the court, in applying New Jersey law, found that without the earmarking of premium payments or other hallmarks of a trust relationship, monthly accounting would demonstrate the existence of a creditor-debtor relationship with respect to premium collections. Also in Twin City Fire Ins. Co. v. Green, supra, the court considered that the dealings between the insurance company and the agent might evidence an intention to take the arrangement out of the operation of the predecessor of the Missouri statute cited in Clay v. Eagle Reciprocal Exchange, supra, and to treat the agency as a debtor on a running account. The record here is sparse as to any conduct or dealings between the parties which would color the nature of their relationship. It discloses merely that segregation or strict accounting of premiums was not expected. After several informal demands, the first actual bill was not rendered by Commercial until July 1967, more than six months after the placement of the policy. Thus the parties did not even adhere to an accepted custom that premiums be remitted promptly within 60 days. Bills were then sent by Commercial on a monthly basis which encompassed transactions in addition to Seabrook's, suggesting a running account between the parties. It cannot be said that there was a course of dealing between Commercial and defendants which would in any sense bolster the creation of a trust. In short, there is no basis for determining that defendants were required by any contractual understanding express or implied to become trustees of Commercial with respect to the collected premiums.
*120 Additionally, Commercial has been unable to point to any New Jersey statute which expressly requires an agent to segregate collected premiums or to establish a trust with respect thereto. N.J.S.A. 17:22-6.2a, dealing with brokers acting in the capacity of agent, codifies the common law duty of an agent-broker to accept premiums from an insured as payment to the carrier in order to protect the insurance-buying public. Mt. Vernon Fire Ins. Go. v. Gillian, supra; Kubeck v. Concord Ins. Co., supra. Moreover, no special considerations founded in public policy have been urged which would dictate the positing of a trust. There is not here involved the protection of the insurance-buying public (e.g., Mt. Vernon Fire Ins. Co. v. Gillian and Kubeck v. Concord Ins. Co., supra) or third persons such as creditors or other policyholders (e.g., Bohlinger v. Ward & Co., supra). As far as the carrier itself is concerned, there was nothing to prevent Commercial from protecting itself as a cestui que trust. Such contractual safeguards were employed, for example, in Spilka v. South American Managers, Inc., 54 N.J. 452, 456 (1969), where "[t]he agent acknowledged in the agreement that all premiums it collected are trust funds belonging to the insurer and that its duties and obligations with respect thereto shall be those of a trustee under the laws of the State of New Jersey." Similar protective provisions were detailed in Manufacturers' Cas. Ins. Co. v. Mink, supra. Commercial, in sharp contrast, was content merely to file with the Commissioner of Banking and Insurance a certificate designating Apgar as an authorized agent  a pro forma compliance with N.J.S.A. 17:22-6.14.
Commercial is not defeated by its failure to establish the requisites of a tortious conversion against defendants. Defendants acknowledge that "[w]hen proof of an alleged conversion fails, the result is only a breach of contract." This concession is apparently premised on the proposition that a party may forego the tort and establish liability on a contract basis. Colton v. Gross, 3 N.J. Misc. 170, 127 A. *121 574 (Sup. Ct. 1925); Republic of China v. Pong-Tsu Mow, 15 N.J. 139 (1954). Indisputably, Commercial is owed $35,000.
Plaintiff further contends that it is entitled to "a judgment in fraud." It asserts that the dereliction of defendants, and particularly Apgar, was fraudulent notwithstanding its allegations of fraud are intertwined in its claim of tortious conversion. It has been recognized that a defendant may be liable in both contract and tort. Manufacturers' Cas. Ins. Co. v. Mink, supra. If fraud has been demonstrated but the tort of conversion as such has not been established because of evidential or legal insufficiency  and it be acknowledged that at the very least the putative tortfeasor is liable as a debtor in contract  the acts of fraud should appropriately be considered in determining the nature and extent of the defendants' liability.
Throughout the transaction Apgar evinced a lack of candor and business honesty. In his first encounter with Commercial he failed to disclose that Seabrook, a prospective insured, had already paid $25,000 as an advance on insurance. Such an intentional concealment of material information is tantamount to an affirmative misrepresentation. Medivox Productions, Inc. v. Hoffmann-LaRoche, Inc., 107 N.J. Super. 47 (Law Div. 1969). Commercial, however, was not misled or induced to accept the insurance risk by this circumstance. But Apgar perpetuated this concealment and thereby affected Commercial's subsequent actions. After the issuance of the policy on December 7, 1966 Apgar did not inform Commercial that the premiums had been paid either to him or to Parkwood. In fact, Apgar affirmatively indicated that the full premium had not been received. In the face of mounting demands, he advised Commercial that payment could not then be made because of financial complications involving the estate of one of the principals of Seabrook. He then stated to Commercial that the insured had taken the policy on an installment basis. Those representations were false and made with the intention that Commercial *122 defer collection of the full premiums. Commercial indeed relied upon Apgar's misrepresentations. It agreed to accept payment from Apgar on an installment basis. It received a check from Parkwood on June 8, 1967 in the amount of $17,808. This check was not paid for insufficient funds. Although Apgar contended that it was the understanding of the parties that the check was not to be deposited by Commercial when received, in point of fact he never made the check good. Thereafter Commercial cancelled the insurance policy and was sued by Seabrook. And, of course, it was compelled to institute the within action.
These facts establish the constituent elements of fraud. Louis Schlesinger Co. v. Wilson, 22 N.J. 576 (1956); Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369 (App. Div. 1960); Parker Precision Products Co. v. Metropolitan Life Ins. Co., 407 F.2d 1070 (3 Cir.1969). There were false representations by Apgar with the intent that Commercial rely thereon; there was knowledge on the part of the defendants that the representations were false; there was a reasonable belief by plaintiff that the representations were true; there was reliance on these representations, and there was consequent action taken by Commercial to its detriment and injury.
Apgar denies his individual liability to Commercial and contends that Parkwood was the insurance agent. The agency relationship is shrouded in confusion because the parties themselves treated this with indifference. Both Apgar and Parkwood were licensed insurance agents. As previously noted, Apgar was designated by Commercial as the authorized agent and he is chargeable with knowledge thereof. Commercial indicated that Parkwood was the agent on the temporary binder, but Apgar countersigned the insurance policy as the agent in fulfillment of the statutory requirement for such countersignature. N.J.S.A. 17:22-6.15. Commercial's monthly billings were addressed to "Parkwood Agency." In view of these conflicting circumstances, the designation by Commercial of Apgar as the *123 authorized agent and his countersignature of the insurance policy pursuant to N.J.S.A. 17:22-6.14, 17:22-6.15 are the significant factors. Apgar must be considered the agent in this transaction together with Parkwood.
A resolution of the issue of actual or implied agency as between both defendants is not essential to a determination of their liability. Defendants have acknowledged the debt to Commercial. The agency of Parkwood is conceded. Parkwood received the premiums from Seabrook through Apgar. The premiums due Commercial were deposited in Parkwood's account and disbursed for the personal use of Parkwood and Apgar. Parkwood itself, therefore, through its principal officer, participated in the wrongful withholding of the premiums and the fraud incidental thereto. McGlynn v. Schultz, supra.
Apgar was personally responsible for the acts of fraud which occurred. Fraud may be committed, as in this case, by an individual through his ownership, control and manipulation of a corporate entity. Such an individual will not be shielded because he utilized the instrumentality of a corporation. McGlynn v. Schultz, supra. As stated in Vreeland v. New Jersey Stone Co., 29 N.J. Eq. 188, 195 (Ch. Div. 1878), aff'd 29 N.J. Eq. 651 (E. & A. 1878):
"All who get gain by fraud must bear the legal consequences of the wrong they do. When a fraud is committed in the name, and under cover of a corporation, by persons having the right to speak for it, for their personal gain and benefit, they are bound to answer personally for their wrongful acts. Their tongues uttered the false words and their purses should pay the damages."
Defendants assert that they are entitled to a set-off for commissions earned for the placement of the insurance policy with Seabrook. Ordinarily, as conceded by Commercial, even in the absence of an express agency agreement an insurance agent responsible for the placement of insurance would be entitled to a commission. But an insurance agent who commits a fraud against his principal forfeits *124 his right to compensation. Budnick v. Maccabees, 230 N.Y.S. 2d 271 (N.Y. City Ct. 1962); cf. Carpenter v. Overland Tire Co., 102 N.J.L. 196 (E. & A. 1925). In failing to remit any of the premiums, defendants were guilty of a willful and total breach of contract, indelibly tainted with fraud. They did not earn their commissions.
Plaintiff projects an additional theory to justify recovery against defendants. It contends that the failure to remit collected premiums and their subsequent use by defendants for their own personal and business needs constituted a fraudulent transfer, contrary to N.J.S.A. 14A:14-10. Commercial conducted what was described as an "audit" of Parkwood in July 1967. It was not made clear exactly what books and records of defendants were examined. The evidence nevertheless indicates that the $35,000 was in Parkwood's general bank account at the end of December 1966 and that by June 1967 this account was overdrawn. Disbursements were apparently made for Apgar's salary and for rental, mortgage and other business expenses. It cannot be concluded, however, that any of these disbursements, to the extent that they constitute transfers within the meaning of the pertinent statutes, were "without fair consideration" or, in the absence of a complete depiction of Parkwood's net worth, including assets and liabilities, that the disbursements were made while Parkwood was or would likely become insolvent. In brief, the evidence was insufficient to substantiate this aspect of plaintiff's claim.
Plaintiff herein has eschewed exemplary or punitive damages based upon defendants' fraud. Consequently, it is entitled to $35,000, representing the balance of the full premiums collected by defendants, together with interest from February 7, 1967, and costs.
In accordance herewith, judgment in fraud is rendered in favor of plaintiff against both defendants.