869 A.2d 468 (2005)
376 N.J. Super. 153
ADVANCED ENTERPRISES RECYCLING, INC. and American Supplies Sales Group, Inc., Plaintiffs-Respondents,
v.
Martin BERCAW, American Landscape Supply, Inc., Bercaw Landscape Supply, Inc., and Organic Landscape Supply, Inc., Defendants/Third-Party Plaintiffs-Appellants.
v.
Agro Products, Inc. and Kti, Inc., Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 2004.
Decided March 23, 2005.
Mitchell B. Seidman, Roseland, argued the cause for appellants (Seidman & Associates, attorneys; Mr. Seidman, of counsel and on the brief).
Michael J. Faul, Jr., Roseland, argued the cause for respondents (Walder, Hayden & Brogan, attorneys; Mr. Faul and Thomas J. Spies, of counsel and on the brief).
Before Judges PETRELLA, LINTNER and PARKER.
The opinion of the court was delivered by
*469 PARKER, J.A.D.
In these consolidated appeals, defendants Martin Bercaw and his three companies, American Landscape Supply, Inc. (ALS), Bercaw Landscape Supply, Inc. (BLS) and Organic Landscape Supply, Inc. (OLS), appeal from a grant of partial summary judgment awarding $172,064.86 in damages and interest to plaintiffs, Advanced Enterprises Recycling, Inc. (AERI) and American Supplies Sales Group, Inc. (ASSG), and dismissal of defendants' counterclaim and third-party complaint. Defendants also appeal from a separate order, entered on March 27, 2003, in which plaintiffs were awarded approximately $200,000 in counsel fees. In their complaint, plaintiffs sought to recover amounts defendants allegedly failed to pay for mulch that plaintiffs had supplied to ALS. Defendants counterclaimed, alleging breach of contract, fraud and misrepresentation, and filed a third-party complaint against Agro Products, Inc., a subsidiary of AERI, and KTI, an alleged successor to AERI and ASSG.
The relationship between plaintiffs and defendants began in 1988, when AERI sold wood mulch products to ALS for ALS's landscaping business. AERI manufactured the wood mulch product. A few years later, ASSG was formed to market and sell the mulch manufactured by AERI. ALS sold plaintiffs' mulch to end users, such as nurseries and landscape suppliers, usually on a C.O.D. basis. Bercaw was the sole shareholder and founder of all three defendant companies.
Because the principals of the companies knew each other personally since 1988, they operated without a written agreement. Plaintiffs invoiced ALS for each shipment. Each Monday, ALS remitted monies on sales of the mulch that it had made during the week past. By virtue of that arrangement, plaintiffs were paid when ALS was paid by its customers. As Bercaw stated: "When I got paid, they got paid." The parties had agreed that ALS would pay interest at the rate of 1.5 percent per month, or eighteen percent per annum, on all unpaid amounts starting thirty days after the date of the invoice for the sale of mulch to ALS.
Frank Peterpaul, a principal of AERI and ASSG, testified in his deposition that ALS was formed as a marketing strategy by AERI to promote its new recycled, decorative landscape and wood mulch. Peterpaul claimed that he and Bercaw had agreed that ALS would sell AERI's wood mulch products exclusively. The parties adhered to that agreement for seven years. Bercaw, on the other hand, claimed in his certification that ALS was an entirely independent entity and that he had established ALS's customers for the mulch products on the basis of his expertise and knowledge of the industry. Nevertheless, Peterpaul claimed that he and his brother "controlled in every respect the business and sales functions of ALS," and allowed Bercaw very little leeway in the range of his commissions. Although ALS billed its customers on ALS invoices, Peterpaul asserted that orders were placed through AERI's offices and the product was delivered directly to ALS customers by AERI.
The arrangement between the parties worked without a problem until 1994, when ALS began receiving complaints from its customers regarding the quality of AERI's mulch. When Bercaw related these complaints to AERI, no action was taken. Bercaw claimed that the creation of ASSG around 1993 caused name confusion among ALS customers because the word "American" was in the names of both entities. In February 1995, Bercaw claimed that AERI's in-house comptroller attempted to download ALS customer information, along with invoicing and payment information, *470 from Bercaw's computer. When Bercaw asked the accountant what he was doing, the accountant replied that he was just doing what he was told. After this incident, problems between the parties escalated.
Bercaw began receiving reports that plaintiffs were offering lower prices for the mulch directly to ALS customers and he claimed that AERI became "secretive" about delivery of mulch to ALS customers. Early in 1996, Bercaw discovered that AERI, through ASSG, had hired two mulch salesmen who were approaching ALS customers, asking them to buy directly from AERI. In that same year, 1996, ALS began distributing mulch products other than AERI's and selling in new geographic areas. Bercaw attested that he sought new products because his customers were dissatisfied with AERI's mulch. Bercaw claimed that Peterpaul was aware of these changes, but Peterpaul denied that Bercaw had told him ALS was selling mulch from other manufacturers.
Bercaw formed OLS in February 1996 to conduct business in an unrelated sector of the landscaping industry: clearing trees and manufacturing new, rather than recycled, mulch from the trees. Within a year, however, Bercaw learned of another company in New York using the name "organic." In order to avoid name confusion, Bercaw formed BLS in March 1997 to undertake the OLS business. OLS was dissolved in September 1997.
When Peterpaul learned in late 1996 that ALS was selling other products, AERI terminated its relationship with ALS, claiming a "material breach" of their agreement. On December 31, 1996, Peterpaul told Bercaw that AERI would no longer honor ALS's sales of AERI's mulch and would not make any more deliveries to ALS customers. Shortly thereafter, AERI, through its subsidiary, Agro Products, sent letters to ALS's customers informing them that ALS was no longer authorized to sell AERI's products.
Bercaw claimed that representatives of AERI began disparaging ALS to its customers and that AERI attempted to interfere with ALS's suppliers in an effort to cut off ALS's supply of mulch. According to Bercaw, he learned in the spring of 1997 that AERI personnel were talking with ALS's suppliers. He further claimed that plaintiffs misled ALS customers as to the quality of ALS products. Defendants alleged that they suffered damages as a result of AERI's direct sales to ALS's customers, and AERI's refusal to supply mulch through the end of ALS's winter sale in 1997. Peterpaul stated, however, that AERI's and ASSG's representatives were instructed not to approach any of ALS's customers.
In April 1997, ALS ceased invoicing customers and BLS took over the sale of wood mulch products, in part because of Bercaw's concern over customer confusion between ALS and the plaintiff companies. ALS was not dissolved, however, although after September 1997, BLS sold wood mulch products to customers previously serviced by ALS.
In his deposition, Bercaw acknowledged that ALS had received monies from clients who had bought plaintiffs' mulch and that ALS had not turned those funds over to plaintiffs. Specifically, Bercaw noted that funds received after December 31, 1996 were not paid, in part, because Bercaw never received a final bill from plaintiffs as he had requested.
Bercaw was unable to quantify the amount of money he admittedly owed to plaintiffs. In late 1998, after his deposition, however, Bercaw prepared a spreadsheet indicating that amounts collected by ALS from its customers on invoices from *471 April 1995 to December 1996 totaled approximately $95,000. Bercaw also compiled a schedule that he claimed "specifically addresses each and every invoice that is allegedly the subject of this dispute." He also created a payment sheet to show the invoices paid with each check written by ALS. The payment sheet reflects approximately $33,000 in payments to ASSG on outstanding invoices.
In June 1999, Allen Binder, a CPA hired by plaintiffs, prepared a list of the unpaid invoices and the amounts received on each. He concluded that there were 195 invoices, totaling $105,264.42, for which plaintiffs had not received any money from defendants. Binder concluded that all but a little over $1,000 of that amount was transferred from ALS to Bercaw, his wife, OLS and BLS. Binder also examined the spreadsheet prepared by Bercaw and concluded that approximately $95,000 of the $104,185 Bercaw transferred from ALS's bank account represented money Bercaw collected on ASSG's open invoices.
The litigation was so contentious that the Morris County Chancery Judge appointed a discovery master. Two years after the litigation commenced, plaintiffs moved for partial summary judgment on counts eight through twelve of the initial complaint and count thirteen of the amended complaint. These so-called book account claims alleged that money was due and owing on the alternative theories of breach of contract, conversion, promissory estoppel and unjust enrichment.[1] Plaintiffs also moved to strike defendants' answer, defenses and counterclaims for failure to comply with discovery orders. Because the discovery disputes continued after the motion was filed, the parties agreed at a case management conference in August 1999 to be bound by the discovery master's determinations as to what discovery was required to be completed before the partial summary judgment motion could be decided.
On December 17, 1999, the parties argued plaintiffs' motion for partial summary judgment and defendants' cross-motion to amend their counterclaim to add a set-off claim for monies withheld by ALS customers who were dissatisfied with the quality and quantity of the mulch provided by plaintiffs.
On February 2, 2000, the judge denied plaintiffs' motions for partial summary judgment and to strike defendants' pleadings. Defendants' motion for leave to file an amended answer, counterclaim and third-party complaint was granted, however.
In February 2000, plaintiffs moved for reconsideration of its motions for partial summary judgment and to strike defendants' answer and counterclaims. The contentiousness of the litigation continued, leading the judge to enter an order on July 24, 2000, directing defendants to comply with all discovery orders within twenty days and to deposit the principal amount allegedly owed to plaintiffs, $105,264.42, with the court. Defendants deposited the funds, and limited discovery on the book account claim was conducted by the plaintiffs in accordance with the discovery orders.
On October 28, 2002, after reconsidering plaintiffs' motion and the voluminous record presented, the judge reversed himself and granted plaintiffs' motion for partial summary judgment on counts eight *472 through thirteen and awarded plaintiffs $172,064.86 in principal and interest. He also granted plaintiffs' motion to dismiss the counterclaim and third-party complaint pursuant to R. 4:23-2 and R. 4:23-4 for defendants' refusal to comply with discovery directives and orders; and permitted plaintiffs to submit an application for counsel fees, limited to discovery issues. The judge certified the partial summary judgment as final pursuant to R. 4:42-2, allowing defendants to appeal.
The judge rendered a lengthy written decision in support of his motion granting partial summary judgment and dismissing defendants' pleadings. Defendants appealed, arguing that the trial court erred in (1) granting summary judgment against ALS on the book account/open invoice claims; (2) holding OLS and BLS liable for converting plaintiffs' property; (3) finding that defendants had committed discovery violations; (4) sanctioning defendants by striking their pleadings; (5) certifying the partial summary judgment as final; and (6) awarding pre-judgment interest to plaintiffs.
We have carefully considered the very extensive record[2] before us in light of the parties' arguments and the applicable law. We are satisfied that the Chancery Judge has properly disposed of the issues before him, except for the conversion issue. Our difference of opinion on the conversion issue does not affect the outcome, however. We affirm substantially for the reasons set forth in the written decision appended to the October 28, 2002 order. R. 2:11-3(e)(1)(A); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
With respect to the conversion issue, the judge found that because Bercaw conceded that he had received payment from the sale of plaintiffs' mulch to third parties and that these amounts had not been remitted to plaintiffs, plaintiffs had established conversion. The court found that Bercaw's transfer of plaintiffs' money to OLS, BLS and his wife was conversion.[3]
The tort of conversion is the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights. Commercial Ins. Co. of Newark v. Apgar, 111 N.J.Super. 108, 114-15, 267 A.2d 559 (Law Div.1970). "It is essential that the money converted by a tortfeasor must have belonged to the injured party." Id. at 115, 267 A.2d 559. An action for conversion will not lie in the context of a mere debt or chose in action, however. Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor. 18 Am.Jur.2d Conversion § 8 (2004); 89 C.J.S. Trover & Conversion § 23 (1955); Lyxell v. Vautrin, 604 F.2d 18, 21 (5th Cir.1979); ATD Corp. v. DaimlerChrysler Corp., 261 F.Supp.2d 887, 898 (E.D.Mich.2003); Temmen v. Kent-Brown Chevrolet Co., 227 Kan. 45, 605 P.2d 95, 99 (1980). See generally H.D. Warren, Annotation, *473 Nature of Property or Rights Other Than Tangible Chattels Which May be Subject of Conversion, 44 A.L.R.2d 927 (1955); see, e.g., Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1203 (Del.Ch.1988) (holding that under Delaware law an action for conversion of money will lie only where there is an obligation to return the identical money delivered by the plaintiff to the defendant and not where an indebtedness may be discharged by the payment of money generally); In re Thebus, 108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260 (1985) (holding that an action for conversion of funds may not be maintained to satisfy a mere obligation to pay money); Dillard v. Payne, 615 S.W.2d 53, 55 (Mo.1981) (holding that conversion does not ordinarily lie for money represented by a general debt).
Here, the funds in question were not deposited with ALS, but were the proceeds of sales made by ALS. Plaintiffs and ALS, therefore, stand in a debtor-creditor relationship. Defendants' reliance on N.J.S.A. 12A:2-401(2) for the proposition that plaintiffs have no title in the mulch or its proceeds is irrelevant. The question is not who has title to the mulch since title has passed to the customer. Rather, the question is whether ALS paid for the mulch (goods) sold to it. Under Article 2 of the Uniform Commercial Code, "goods" are defined as moveable items for sale "other than the money in which the price is to be paid." N.J.S.A. 12A:2-105(1).
In our view, the Chancery Judge erred in holding as a matter of law that defendants converted the funds paid to them for the mulch. Our disagreement with the judge's determination on the conversion issue does not change the outcome, however. As we said previously, we agree with the judge on all other aspects of his decision, including his determination that the corporate defendants are liable on the book accounts. Although the judgment against OLS is moot because that corporation no longer exists, BLS is liable as the corporate successor to ALS, which is no longer active but still in existence and, therefore, liable.
In the consolidated appeal, defendants argue that the trial court erred (1) in finding Bercaw individually and personally liable for attorneys fees, discovery master fees and costs; and (2) in its determination of the quantum of attorneys fees awarded. We have carefully considered the record and the arguments with respect to these issues, and we are satisfied that defendants' arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(A), (E). We affirm substantially for the reasons stated by the Chancery Judge in his written decision appended to the final judgment for attorneys fees, discovery master fees and costs entered on March 27, 2003.
Affirmed.
NOTES
[1] The first seven counts of the complaint, not at issue in this appeal, alleged breach of contract and fiduciary duty, misappropriation of proprietary information and unfair competition, fraud and misrepresentation, interference with prospective economic advantage, unjust enrichment and constructive trust.
[2] In our view, this litigation was extraordinarily wasteful of the court's and parties' resources as evidenced by counsel fees for plaintiff alone in excess of $200,000 pursuing a book account claim of $105,264.42. We were presented with in excess of 3,700 pages of appendices by defendant and in excess of 2,000 pages by plaintiff, much of it duplicative and irrelevant to the issues on appeal.
[3] The court declined to pierce the corporate veil to hold Bercaw personally liable because it found that Bercaw had not "conducted and created the co-defendant entities for the purpose of perpetuating fraud or illegal acts." Rather, the court held the corporate defendants jointly and severally liable for the award. We do not disagree with this holding.