32 A.3d 1158

DR. ENRICO BONDI, AS EXTRAORDINARY COMMISSIONER OF PARMALAT FINANZIARIA S.P.A., PARMALAT S.P.A., AND OTHER AFFILIATED ENTITIES IN EXTRAORDINARY ADMINISTRATION, PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. CITIGROUP, INC., CITIBANK, N.A., VIALATTEA, L.L.C., BUCONERO, L.L.C., AND EUREKA SECURITISATION P.L.C.,[1] DEFENDANTS–RESPONDENTS/CROSS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued: May 4, 2011—Decided: December 22, 2011.

---

[1] Incorrectly identified in the complaint as "Eureka Plc."

382

Before Judges CUFF, SAPP–PETERSON and SIMONELLI.

*Kathleen M. Sullivan* argued the cause for appellant/cross-respondent (*DeCotiis, Fitzpatrick, Cole & Wisler, L.L.P., Ms. Sullivan, Peter E. Calamari, Steven G. Madison, Marc L. Greenwald,* and *Sanford I. Weisburst* (*Quinn Emanuel Urquhart Oliver & Hedges, L.L.P.*) of the New York bar, admitted pro hac vice, attorneys; *Ms. Sullivan, Mr. Calamari, Mr. Madison, Mr. Greenwald* and *Mr. Weisburst,* of counsel; *Michael R. Cole* and *Gregory J. Bevelock,* on the brief).

*John F. Baughman* (*Paul, Weiss, Rifkind, Wharton & Garrison* ) of the New York bar, admitted pro hac vice, argued the cause for respondents/cross-appellants (*Stern & Kilcullen, Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.,* and *Mr. Baughman,* attorneys; *Theodore V. Wells, Jr.,* and *Mr. Baughman,* of counsel; *Herbert J. Stern* and *Andrew Bosin,* on the brief).

The opinion of the court was delivered by

CUFF, P.J.A.D.

Between 1961 and 2003, Parmalat Finanziaria S.p.A., (Parmalat) grew from a regional dairy in Italy producing and distributing milk and milk products to a multi-national corporation producing and distributing food products, including dairy products. Its growth was initiated by a technique developed by it to extend the

shelf life of milk. Parmalat accomplished its growth by acquiring other corporations. This growth required financing and many multi-national lenders, such as defendants Citigroup, Inc. and Citibank, N.A. (collectively Citi), were willing to loan large sums of money. Parmalat's collapse in December 2003 spawned a wide array of legal proceedings, including civil actions here [2] and in Italy by lenders and investors, as well as criminal prosecutions in Italy. Parmalat's collapse also triggered some reform in Italian bankruptcy law by instituting a type of reorganization known as extraordinary administration.

Dr. Enrico Bondi is the administrator [3] appointed by the Italian government to oversee the reorganization of Parmalat following its collapse in December 2003. On July 29, 2004, Bondi filed a complaint against Citi, Buconero, L.L.C. (Buconero), Vialattea, L.L.C. (Vialattea), and Eureka Securitisation Plc (Eureka). Citi was one of several financial firms that served as an investment banker for Parmalat. In essence, Bondi accused defendants of facilitating, covering up and profiting from various improper and illegal financial manipulations orchestrated by Parmalat's founder and key managers over a protracted period of time. The manipu-

---

[2] Investors brought actions alleging securities fraud against Parmalat's directors, accountants, bank and lawyers. These actions have been consolidated and are pending in the United States District Court for the Southern District of New York. *See In re Parmalat Secs. Litig.*, 350 *F.Supp.*2d 1356 (Jud.Pan.Mult.Litig.2004). Bondi commenced actions in his own name against accounting firms Grant Thornton International, Deloitte & Touche, and affiliates in the United States District Court for the Northern District of Illinois that were transferred to the United States District Court for the Southern District of New York for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. *See ibid.* Bondi also commenced an action against Bank of America and its affiliates in the United States District Court for the Western District of North Carolina, which was also transferred to the United States District Court for the Southern District of New York. *See Bondi v. Bank of Am.*, 381 *F.Supp.*2d 283, 287 (S.D.N.Y.2005).

[3] Bondi's official title was Extraordinary Commissioner. Following reorganization, he was appointed Chief Executive Officer of the company and served in that position until June 2011, when a French company, Lactalis, won control of the company, referred to in the record as New Parmalat.

lations allowed Parmalat to artificially inflate company value and cash flow and to obscure debt ultimately resulting in the loss of billions of dollars to corporate creditors and investors.

Specifically, Bondi sought damages from Citi on ten causes of action: fraud (Count I), aiding and abetting fraud and constructive fraud (Count II), negligent misrepresentation (Count III), aiding and abetting breach of fiduciary duty (Count IV), diversion of corporate assets (Count V), unjust enrichment (Count VI), aiding and abetting fraudulent transfers (Count VII), deepening insolvency (Count VIII), and participation in civil and RICO conspiracies (Counts IX and X). Citi moved to dismiss the complaint on jurisdictional and forum non conveniens grounds. Judge Jonathan Harris denied this motion.

Defendants also sought dismissal of the complaint on other grounds, including *in pari delicto* and lack of recognition of deepening insolvency as an independent cause of action. Judge Harris denied defendants' motion to dismiss in large part without prejudice but dismissed Count VIII, the deepening insolvency cause of action.

Citi filed an answer and a counterclaim. The latter accused Bondi of fraud, negligent misrepresentation, conversion, and breach of warranties associated with securitization agreements executed in 1995 and 2000.

Prior to commencement of trial in May 2008, all parties filed summary judgment motions. In his April 15, 2008 opinion, Judge Harris held that the *in pari delicto* doctrine barred all of Bondi's tort and contract claims, except the claim that defendants had aided and abetted the Parmalat insiders' larceny and "looting" of company funds and their breach of fiduciary duty to the company. The judge also determined that Italian law governed whether Bondi had standing to seek damages for deepening insolvency, and held that Bondi lacked standing to pursue these damages.

At the conclusion of Citi's case on its counterclaim, Judge Harris dismissed the two breach of warranty claims. The jury

returned a verdict against Parmalat on its remaining aiding and abetting claim and also returned a verdict in favor of Citi on its counterclaims.

In this appeal, we review the $431,318,824.84 judgment [4] entered following the seventy-day jury trial in favor of defendant-counter-claimant Citi and the judgment of no cause of action against Bondi. Bondi argues that the judge erred in granting summary judgment barring most of Bondi's claims against Citi. He also contends the jury verdict is the product of legal error committed by the trial judge, and further contends that the treatment of many, if not all, of Citi's monetary claims in Italian bankruptcy proceedings should bar relitigation of those claims here. In their protective cross-appeal, Citi reiterates an argument pressed four times in the trial court that the complaint should have been dismissed on forum non conveniens grounds. Citi also contends the trial judge erred in admitting evidence of Italian criminal proceedings involving Citi employees and hearsay statements in Italian police reports. Finally, it argues that the trial judge applied the wrong legal standard to the issue of Citi's knowledge regarding the aiding and abetting claim.

We hold that Judge Harris properly applied the *in pari delicto* affirmative defense invoked by Citi to defeat all of Bondi's claims against Citi, except for the claim that Citi aided and abetted larceny by Parmalat senior executives. We also hold that Bondi was not entitled to pursue damages for deepening insolvency under Italian law, and deepening insolvency is not an independent cause of action in this State. In addition, we hold Citi's counter-claims are not barred by res judicata, the verdict on the conversion claim is supported by the record, and Citi has standing to sue for losses sustained by its subsidiaries. Due to our disposition of Bondi's appeal, we do not address the cross-appeal.

---

[4] This sum includes interest up to the date of entry of judgment.

I

We commence our discussion with certain undisputed facts.[5] We relate those facts and then highlight the disputed facts in the light most favorable to Parmalat, the party resisting Citi's motion for summary judgment. In some instances, such as the fraudulent acts orchestrated by the Chief Executive Officer (CEO), the Chief Financial Officer (CFO), and twenty-nine identified Parmalat insiders, the parties do not dispute the details of the transactions but dispute the import of those facts.

A. The Growth of Parmalat and Actions of Corporate Insiders.

Calisto Tanzi founded Parmalat, then known as Dietelat, in 1961. The family-owned company grew rapidly after developing a process that substantially extended the shelf life of milk. Parmalat became a publicly-owned company in 1990 and continued to expand its business and product lines in large part through acquisitions of existing businesses. By 2002, it was the leading milk distributor in Canada, Brazil and Italy, operating in thirty countries, including the United States, and employing more than 35,000 people world-wide. By 2002, the company also had over 200 subsidiaries worldwide, including Parmalat, a wholly-owned Italian company, and Bonlat Financing Corp. (Bonlat), a wholly-owned Parmalat subsidiary in the Cayman Islands. Bondi acknowledged that Tanzi was the majority Parmalat stockholder, and the governance structure vested the CEO position occupied by Tanzi with "all-controlling" power over the entire corporation. Bondi also admitted that Tanzi was involved in the fraudulent activities with a limited group of corporate officers and managers,

---

[5] The trial of this matter proceeded over seventy days. The parties presented live and deposition testimony of more than forty fact witnesses and six experts. On appeal, each issue presented by Bondi is a legal issue informed by the summary judgment record or the trial record. Unless otherwise noted, the facts discussed in this opinion are predicated on the statement of material and undisputed facts submitted by both parties in support of and in opposition to their cross-motions for summary judgment.

and these fraudulent activities ultimately caused the collapse of the company.

Bondi identified Fausto Tonna, the CFO, and twenty-nine other persons who were involved in the various schemes, including thirteen directors, some relatives of Tanzi, Alberto Ferraris (the CFO's successor in March 2003), a company vice-chairman, the "outside" corporate legal counsel, and other individuals holding high-level positions. Among this latter group were the heads of customer accounting, treasury and finance, internal audit, director of sales, chair of the statutory board of auditors, CFOs of Parmalat subsidiaries, and members of some of Parmalat's internal boards. Tanzi and these insiders directed the distribution of € 85 million in Parmalat dividends between 1998 and 2003, of which approximately € 43 million went to Tanzi and the balance to insiders, including directors of the corporation. Not all directors were involved in the scheme.

In fact, Bondi also admitted that Tanzi and top executives associated with Tanzi and their consultants manipulated accounting devices and used off-shore financial companies to hide Parmalat's actual financial condition and to improve its performance artificially. One of the top executives was CFO Tonna.

It was also largely undisputed that Parmalat actually had a negative net worth as early as 1990, contrary to the financial statements produced by the corporation. It is not disputed that financial statements generally consist of a balance sheet, an income or profit and loss statement, a cash flow statement and explanatory notes. Investors routinely rely on financial statements to assess the health of a company. A financial statement provides a snapshot of assets, debts, and net worth at a given time. Financial statements also depict the relationship between a company's reported debt and equity (the debt-to-equity ratio). The parties agreed that the higher the debt-to-equity ratio, the riskier the company is considered by investors and lenders. The parties also agreed that a company's debt-to-equity ratio and its

financial statements are key elements in determining a credit rating.

The financial statements produced by Parmalat between 1994 and 2002 indicated strong earnings, growth in production facilities and employees, large amounts of cash and other liquid assets and large amounts of debt. Bondi admitted that the publicly-filed Parmalat financial statements from 1990 to 2002 were not prepared in accordance with Italian law or in accordance with generally accepted accounting practices (GAAP) applicable to public Italian companies and did not accurately reflect the level of debt carried by the corporation. Bondi also admitted the company's board of statutory auditors [6] recommended approval of all of Parmalat's financial statements between 1990 and 2002 and, at various times, three external auditors certified that the financial statements accurately represented Parmalat's financial condition.

Parmalat generally reported large cash reserves and other liquid assets. By 2002, Parmalat reported that a Bank of America account contained over $4 billion. In December 2003, however, Citi and the public in general learned that neither the $4 billion nor the Bank of America account existed. This cash deposit was related to a Parmalat subsidiary known as Bonlat.

Bondi does not dispute that Bonlat was incorporated on November 25, 1998, in the Cayman Islands. Its financial results were consolidated into Parmalat's consolidated financial statements, but its activities were non-existent. Parmalat Capital Finance, a Parmalat group company, purportedly loaned Bonlat $7 billion but all or part of that sum was not actually loaned to Bonlat and certain Parmalat insiders removed approximately $5.176 billion in debt from Parmalat's consolidated financial statement through transactions with Bonlat.

---

[6] In Italy, financial statements are prepared by the company and its board of directors. The company's board of statutory auditors is responsible for supervising the decisions of management and the proper functioning of internal controls to ensure an accurate accounting. It is not disputed that Parmalat's internal controls were poor.

In addition, Parmalat's bank debt was understated by $500 million as a result of $500 million of bonds issued by Parmalat Capital Finance that were offset by non-existent securities purportedly held by Bonlat. $985 million of Parmalat's bank debt was transferred to Bonlat through inter-company transfers and reclassified as inter-company debt. In addition, $298 million of Parmalat bank debt from lines of credit was transferred to Bonlat through inter-company transfers, thereby reducing the amount of bank debt reported in Parmalat's consolidated balance sheet. Bonlat was also used to book fictitious sales of millions of dollars of trademark and other intellectual property.

Parmalat fabricated a false bank account at Bank of America to create assets that did not exist. At the end of 2002, Bonlat's records showed a balance in excess of $4 billion in this account. From 1999 through 2002, the false bank account and its purported balance were documented in letters seemingly issued by Bank of America. The letters were forged by an employee in Parmalat's finance department. Bondi admitted that he found no evidence that Citi participated in the forgery.

B. Parmalat–Citi Relationship.

The Parmalat–Citi banking relationship commenced in 1994 and continued until Parmalat's collapse in December 2003. Citi regarded Parmalat as a "platinum client" that generated significant revenue and served as the corporate banker for many transactions in addition to the five transactions at issue in this case. Citi was not, however, the only banker used by Parmalat between 1994 and 2003.[7]

Citi entrusted a parent account manager (PAM) to oversee the parties' relationship. The PAM served as a liaison between the bank and the corporate client and concentrated on origination of

---

[7] One Citi employee testified that as of March 2001, Citi had approximately 38% of Parmalat's banking business. Other commercial banks, such as Bank of America and Merrill Lynch, also served Parmalat's banking needs.

new business and management of existing business. Alberto Ferraris acted as Parmalat's PAM from 1994 until he became CEO of Parmalat Canada in 1997. He became CFO of Parmalat in March 2003, when Tonna resigned. Filippo Sabatini replaced Ferraris in July 1997, and served as PAM until March 2000; Paola Botta oversaw the relationship from April 2000 to December 2003. The PAM was part of a group within Citi known as the Global Relationship Bank (GRB). It consisted of several groups in several locations serving Citi's largest multi-national clients. The GRB contained persons with specialized knowledge about specific business sectors and products. The GRB also contained persons, known as transactors, who were responsible for coordinating various types of transactions.

Among the teams at Citi with whom the PAM facilitated communication on behalf of its corporate clients, such as Parmalat, was the institutional recovery management group. This group was responsible for reducing the bank's credit exposure in its dealings with troubled companies. Other teams included a group of public equity research analysts, a structured corporate finance group, and the global loan portfolio management group. The latter group was responsible for monitoring credit and had the authority to approve or reduce client credit.

Bondi alleged that Citi was not a victim but a knowing participant in the fraud. He focused his allegations on five transactions: the Parmalat Canada transaction, the Geslat transaction, the securitization program, the leaseback transaction, and the derivatives transaction. In doing so, he concedes that there is no evidence of looting or diversion of funds from these transactions by Tanzi, Tonna or other insiders. Bondi alleges, however, that the structure of these transactions, particularly the Parmalat Canada and the Geslat transactions, contributed to Parmalat's deepening insolvency and cloaked debt levels by characterizing loaned funds as equity rather than debt. Bondi also conceded that Parmalat Canada was one of Parmalat's most profitable subsidiaries.

1. Parmalat Canada.

Parmalat acquired three Canadian companies between 1997 and 1998: Beatrice Foods, Inc. (Beatrice) in April 1997; Ault Foods (Ault) in July 1997; and Astro Dairy Products (Astro) in November 1998 (collectively Parmalat Canada). Citi arranged financing for the transactions, and acted as financial advisor in the Beatrice acquisition through its subsidiary, Citinvest S.p.A. Citinvest was retained to provide financial advisory services regarding the structure, negotiation, strategy and tactics for the transaction. Other professionals were also retained by Parmalat for these three acquisitions, including legal counsel, Coopers & Lybrand to perform a due diligence review of Beatrice, and Grant Thornton, an independent auditing firm retained by Parmalat, to issue an opinion on how to report the Beatrice transaction in its financial statements.

To finance the Beatrice acquisition, Citi arranged a syndicated loan and made an equity investment in Parmalat Canada equivalent to 24.9% of non-voting shares. A stock certificate documented Citi's shares in Parmalat Canada. Citi's equity investment was subject to a "put" agreement, which generally provides a buyer the right, but not the obligation, to sell a designated asset at a specified price, but the seller of the put option has the obligation to buy the asset at the specified price, if the option is exercised. Citi made additional equity investments when Parmalat acquired Ault and Astro but its holdings in Parmalat Canada always remained at 24.9%. The original put agreement was amended eight times. When the initial public offering originally contemplated for Parmalat Canada did not occur, Citi exercised its put option in January 2002, and realized $182 million (Canadian).

Bondi argues the Citi equity investment was disguised debt and the disclosures were inadequate because the right to exercise the put option was unconditional. He also argues that Citi intentionally structured the transaction in this manner to understate Parmalat's debt and to avoid risk to it.

Citi presented evidence that its pre-transaction evaluations indicated that the put option would provide Citi with a credit risk profile substantially comparable to a loan. The record reveals that Grant Thornton eventually rendered an opinion that the Citi investment could be reported as equity, although initially, internal Citi documents considered the debt or equity characterization as a debatable issue. KPMG, another accounting firm, also rendered an opinion that it was not necessary to report the initial put agreement as debt in the financial statements. Ultimately, Parmalat disclosed the Parmalat Canada transactions in the notes to its 1997 consolidated statements and phrased subsequent disclosures from 1998 through 2001 in similar terms.

The 1997 consolidated statements described the Citi participation in the Parmalat Canada transaction as follows: "The acquisition was carried out by Parmalat Canada, Inc., a company set up for this purpose, owned 75.1% by the Parmalat Group and 24.9% in shares without voting rights, by a subsidiary of Citicorp." A note described the put agreement as follows:

In the event certain conditions should occur, as contractually provided, including the failure of the company to be listed at latest by the first months of 2007, the Parmalat Group has a potential liability to purchase the 24.9% of Parmalat Canada Inc. now held by Citicorp, at a price which, up until April 1999, will be equal to 140.7 million Canadian Dollars, and subsequently to be calculated based on the consolidated operating results of Parmalat Canada Inc.

Grant Thornton certified the accuracy of Parmalat's 1997 and 1998 financial statements; Deloitte & Touche certified Parmalat's financial statements for 1999, 2000 and 2001.

2. Geslat Transaction.

Citi entered into two transactions with a Parmalat subsidiary, Gestione Centrali del Latte Srl (Geslat) in 1995 and 1999. The transaction used an investment instrument unique to the Italian Civil Code known as an Associazione in Partecipazione (AiP). The AiP structure, called Sirius by Citi, was a financial product that Citi sold to other European companies such as Gucci, Barilla and France Telecom. In its simplest terms, by taking advantage of certain tax laws, the AiP structure purported to provide medium-

term (five-to-ten-year) financing at a substantially cheaper cost than more traditional fund-raising options. In both transactions, Citi subsidiaries, such as Citibank International Plc., provided funds to Geslat pursuant to AiP agreements. Geslat used the funds to make inter-company loans to other Parmalat subsidiaries.

Citi also entered into a put agreement with Parmalat that gave Citi the option to sell its participation in Geslat to Parmalat at a fixed rate of return on or after a specified date. Citi also entered into an insurance and indemnity agreement with an unrelated entity for a surety bond to guarantee payments to Citi if it exercised its put option. Citi exercised its put option on February 22, 1999, the first date allowed by the 1995 put agreement.

Citi entered a similar agreement with Geslat in 1999 through another subsidiary, defendant Buconero. The 1999 agreement was amended in 2001 to increase Citi's investment from € 60 to € 117.3 million. Contemporaneously, Vialattea, another Citi subsidiary and parent of Buconero, purchased a stake in Geslat for € 205,000, later increased to € 2.7 million. As with the 1995 agreement, the 1999 transaction provided Parmalat with lower than market rate financing. The 1999 agreement, however, was governed by United States rather than United Kingdom tax laws and did not include a put agreement as in 1995. Instead, the parties used a business plan and transaction operating agreement, which Bondi's forensic accounting expert opined functioned like a put agreement.

Bondi contends the net effect of the 1995 and 1999 AiP transactions was to inappropriately remove € 120 million in debt from Parmalat financial statements. He concedes, however, that the 1995 and 1999 Geslat transactions were discussed in a letter to shareholders at the beginning of Geslat's financial statements from 1995 through 2002. He contends, however, that the disclosure was immaterial because investors reviewing the Parmalat financial statements would not know to consult the Geslat financial statements. It is undisputed that the transactions were highly profitable to Citi due to fees paid to Citi and other sureties obtained to reduce Citi's risk of loss.

### 3. Securitization Transaction.

Citi provided securitization services to Parmalat through two transactions: one in 1995, the other in 2000 that continued through 2003. Citi used two "special purpose vehicles," Eureka and Archimede Securitization Srl (Archimede). Eureka raised funds in the marketplace which it forwarded to Archimede to purchase receivables from Parmalat. The 2000 program purchased receivables from Parmalat's Italian, Canadian and United States subsidiaries.

Securitization programs use receivables to raise cash or for use as collateral. The sale of receivables is generally considered an off-balance sheet transaction. Once sold, the receivables are removed from the balance sheet in a process known as de-recognition. The cash received replaces the asset and no liability is created in the process; therefore, the process occurs "off" the balance sheet.

Under the 1995 and 2000 securitization programs, Parmalat identified trade receivables for securitization and entered information about them in Citi's proprietary software known as Enigma. Once screened as eligible, Citi forwarded an advance funding of these receivables to Parmalat. Eureka and Archimede did not collect customer payments; Parmalat served as collection agent.

Bondi asserted that the securitization program obscured the full measure of financing vehicles used by Parmalat and also allowed Parmalat to cover up other accounting falsifications.[8] He also alleged that the Citi securitization program was designed and operated from its inception as a fraudulent program. Bondi emphasized that in a true securitization program, the seller relinquishes control of the receivable but the Citi securitization program permitted Parmalat to retain control of the receivables. Citi presented evidence that the Parmalat 1995 disclosure of the 1995

---

[8] In fact, Bondi issued a report in 2005 relating that Parmalat insiders had fraudulently used the company's receivables to obtain advance payments in excess of € 3 billion from over forty Italian banks.

securitization program complied with Italian GAAP, assuming Parmalat complied with the rules governing the program.

4. Leaseback Transaction.

In 2003, Citi provided Parmalat advisory services in connection with a sale/leaseback transaction between GE Capital Public Finance, Inc. (GE) and Farmland Dairies, L.L.C. (Farmland), a former Parmalat subsidiary. Initially, Bondi identified the Farmland transaction as another off-balance sheet transaction that served to obscure debt levels. At trial, however, Bondi's accounting expert, Bala Dharan, acknowledged that the transaction actually was an on-balance sheet transaction and perfectly legitimate. He offered no opinion whether the transaction had been formulated to facilitate looting.

5. Derivative Transactions.

Citi executed several derivative transactions for Parmalat. A derivative is an obligation or benefit that depends for its value on some future performance of an underlying asset. International companies, such as Parmalat, used derivative transactions, particularly foreign exchange transactions, to manage risk. Dharan concluded that Parmalat had used three categories of derivative transactions to speculate and borrow money. He also opined that Citi designed the transactions to operate as short-term loans, without the obligations to report the transactions as such. On the other hand, Dharan acknowledged that there was no requirement that Parmalat disclose the risk it sought to hedge and that a company could hedge less than 100% of either its assets or net equity.

C. Indicia of Citi Knowledge and Involvement in Corporate Insider Fraud.

In addition to the five highlighted transactions between Parmalat and Citi, Bondi contended that Citi's knowledge of and involvement in structuring various corporate transactions allowed it to

acquire extensive information. In time, this information provided many "red flags" or warnings of the on-going larceny or looting of corporate assets by corporate insiders. By its willingness to lend money to Parmalat, Bondi contends Citi was complicit in the thefts.

In support of these allegations, Bondi relied on the report of his banking and corporate finance expert, Richard George, who opined that Parmalat had evinced many "classic warning signs" of fraud and mismanagement, of which Citi was fully aware. In George's view, those warning signs included the low-profile management style of Parmalat's principals, and the difficult and domineering personality of Tonna, whom George felt was grossly underqualified citing Tonna's high school degree and employment exclusively at Parmalat.

To further support his allegation that Citi knew about the fraud at Parmalat, Bondi relied on statements and handwritten notations found within various Citi documents. For example, Bondi cited an e-mail in late October 1995, from Jack Wood, a Citi employee, to Sergio Ungaro, a Citi manager who became the functional head of Citi's GRB in Milan in 1996. In that e-mail, Wood advised Ungaro that he had recently received "negative feedback on the Parmalat name" from another bank. Those concerns apparently related to Parmalat's "limited funding flexibility ..., nervousness in [a] meeting, and [the] secretiveness/lack of openness of management." Wood believed that the feedback was a "caution light," and asked, "[h]ow well do we really know Parmalat and what they're up to? Is there reason to look more closely at the name ... or is our info fuller and more recent to conclude we're ok?"

Bondi also relied on handwritten comments in two documents, although the author(s) of those notations is unclear: 1) an August 2, 1995 credit memorandum; and 2) a draft letter, dated December 11, 1998, from Citi to Parmalat proposing terms of a note issue. The August 2, 1995 credit memorandum contained a statement that Parmalat had experienced a "sharp increase in cash and

securities" in 1994. In the margins was a handwritten phrase: "window dressing?"

The December 11, 1998 draft proposal letter contained a chart comparing Citi's deals with other Italian companies. The chart included a transaction sponsored by Enron, and indicated that the proposed transaction with Parmalat could yield premiums that were comparable to the Enron transaction and were significantly higher than others on the chart. Someone had circled several of the numbers in the chart, and beside them wrote: "wow!!! do not want to *show*." Bondi argued documents such as these demonstrated Citi's complicity, and refuted Citi's alleged ignorance of Parmalat's true financial status.

Bondi highlighted other documents which purportedly discussed Parmalat's desperation for funds and in which Citi drew further comparisons between Enron and Parmalat. Yet, Bondi admitted that in most instances Parmalat was desperate for Citi's services, as opposed to vice versa. In addition, Bondi admitted he had no proof of bribes paid by people at Citi to Parmalat insiders.

D. The End of the Parmalat–Citi Business Relationship.

The record also revealed that Citi managers began to express concern about the financial condition of Parmalat in late summer 2002. In September 2002, Citi senior managers met to review the top ten companies with "red flags" or credit weaknesses. They did not believe a "red flag" necessarily connoted internal fraud, misappropriation or looting. The specific concerns identified by this review related to a recently completed sophisticated financial transaction, the fact that Parmalat was highly leveraged, and it was a family-controlled business.

Then, in February 2003, Parmalat made a failed bond offering, which created concerns about the company's health and caused a drop in Parmalat's stock values. Nevertheless, S & P issued a positive credit rating for Parmalat relying heavily on its sizable cash and liquid reserves.

Steven Ekert, who headed the Citi credit risk group, sent Botta, the Citi PAM at the time, an e-mail on February 28, 2003, expressing his concerns about the failed bond offering and suggesting a liquidity review to determine Parmalat's cash flow.

At a March 6, 2003 strategic review meeting with Tonna, Ekert and Botta, Citi discussed with Parmalat the € 3.3 billion in cash and cash equivalents held by Parmalat. Tonna assured Ekert that the company had cash and liquid reserves of € 3.3 billion and he appreciated the flexibility that the large cash reserve offered to the company. Three weeks later, Tonna relinquished his role as CFO; he was replaced by Ferraris, who had served as Citi's PAM when the Parmalat–Citi banking relationship was first established in 1994.

On April 10, 2003, Ferraris conducted a meeting at the Milan Stock Exchange attended by Citi bankers to discuss Parmalat's financial outlook and plans. He described a healthy company with total liquidity of € 3.573 billion and net debt of € 1.862 billion. It is undisputed that Ferraris's April 2003 presentation contained false information.

A September 11, 2003 Parmalat press release noted the company's substantial liquidity held in low-risk financial instruments. The press release contained false information. Citi bankers reviewed this release.

In late September 2003, it is not disputed that Ekert concluded that Citi needed to take additional measures to reduce its exposure and to conduct additional inquiries about Parmalat's cash flow. His recommendations were based on excessive cash balances, high debt levels, aggressive use of derivatives, opaque financial statements, and misleading statements. He recommended no increase in existing lines of credit or approval of new credit facilities. He also placed an order to purchase $100 million in credit default swaps, a financial product used by Citi risk managers to reduce credit risk.

At a November 4, 2003 meeting with Tanzi and Ferraris, Citi representatives "grilled the CFO on liquidity" and whether the cash and cash equivalents existed. Bondi does not dispute that Parmalat representatives advised that its cash investments were held in "highly liquid A-rated corporates." However, Bondi also admitted that as of November 3, 2003, Parmalat did not hold the entirety of cash reported on its balance sheet in highly liquid, highly rated corporate securities.

On November 6, 2003, Consob, Italy's market regulator that monitored public companies, requested Parmalat to clarify its liquidity position. Four days later, Parmalat issued a press release stating that it had approximately € 500 million invested in a foreign mutual fund. This was the first time any Citi official learned about this fund. Parmalat reiterated this advice the next day. Citi also learned that Parmalat lied when it represented that Citi was the only counterparty with which it was executing derivative trades. On November 12, 2003, Parmalat announced that it was liquidating its position in the foreign mutual fund.

Ferraris was replaced as Parmalat CFO on November 14, 2003. On November 20, 2003, Ekert, Botta and other Citi employees met with the new CFO. A week later, Parmalat issued its first of three press releases informing the public that it was experiencing delays in liquidating the foreign mutual fund. As a result, it intended to delay repayment of approximately € 150 million in bonds which had matured.

Bondi was retained by Parmalat as a consultant on December 9, 2003. On December 15, 2003, Tanzi resigned his position as chairman, CEO, and member of the board of directors, and Bondi replaced him as chairman and CEO. On December 19, 2003, Parmalat issued a press release stating that the Bank of America account that allegedly contained $4 billion did not exist. The Italian government approved an emergency amendment to the Italian bankruptcy law, the Marzano Decree, and established procedures for restructuring and processing claims against large insolvent companies. Bondi was appointed Extraordinary Com-

missioner to oversee the reorganization and administration of Parmalat on December 24, 2003. Parmalat was declared insolvent on December 27, 2003, and a reorganized Parmalat (New Parmalat) emerged in 2005.

## II

In his complaint, Bondi alleged that Citi committed fraud in its dealings with Parmalat, aided and abetted fraud and constructive fraud, made negligent misrepresentations and diverted corporate assets, had been unjustly enriched, participated in civil and RICO [9] conspiracies, and at critical times failed to disclose Parmalat's deepening insolvency to the detriment of other creditors and investors. In essence, Bondi sought billions in damages from Citi for facilitating, covering up, and profiting from various improper and illegal financial transactions and manipulations, although Bondi ultimately admitted that the CEO, the CFO and other corporate insiders had falsified financial statements, prepared false bank account statements and sales invoices, and diverted corporate income from 1990 through 2003.

In its answer and in cross-motions for summary judgment, Citi invoked the *in pari delicto* affirmative defense to repulse the complaint filed by Bondi. He, in turn, argued that the acknowledged fraudulent acts by Tanzi, Tonna and other corporate insiders were solely for their benefit. In short, they totally abandoned their responsibilities to the corporation and no benefit accrued to the corporation from their actions. Therefore, Bondi contended the adverse interest exception to the *in pari delicto* defense permitted his various claims against Citi. Citi responded that Bondi had committed acts himself that harmed Citi, it had no knowledge of the fraudulent escapades of the corporate insiders, and the transactions it funded were legal, untainted by fraud, and bestowed benefits on the corporation.

[9] Racketeer Influenced and Corrupt Organization Act, *N.J.S.A.* 2C:41–1 to –6.2.

In his comprehensive opinion addressing the cross-motions for summary judgment, Judge Harris notes that "vicarious knowledge and ultimate responsibility for the wrongdoing of officers and directors is imputable to Parmalat under longstanding New Jersey law." He also found that the facts unquestionably demonstrated that high-ranking corporate directors and officers acted over the years "in ways that had the clear capacity to mislead, misdirect, and mishandle the financial community vis-à-vis Parmalat's true fiscal malaise." In response to the central question of whether their conduct was imputable to Bondi, Judge Harris found that Bondi pursued only corporate interests and could not "demonstrate that the corporate mismanagers were so far a field of advancing Parmalat's business interests that the so-called adverse interest exception applies."

In reaching this latter finding, Judge Harris stated that "[d]iscovery at this stage [10] has plainly demonstrated that the narrow application of this rule has no currency." The judge elaborated as follows:

> No rational trier of fact could reach a conclusion that over so many years, involving so many transactions, involving so many participants, the culpable managers were doing nothing for the company. The legions of vendors, customers, employees and consumers of Parmalat were enjoying the fruits of conduct of the insiders just as assuredly as the insiders may have been individually profiting from keeping the company afloat. The record does not bespeak a situation where a jury needs to sift through conflicting evidence to see if an abandonment of the principal's interests occurred. Clearly, it did not.

In doing so, the judge dismissed all of Bondi's contract and tort claims but for his claim that Citi aided and abetted the looting of corporate assets by Parmalat insiders. This single claim survived summary judgment because Judge Harris found that some evidence advanced by Bondi raised a jury question whether the abandonment and adverse interest exception might apply to this claim. The judge stated, "[t]he evidence is not so one-sided that Citi[ ]'s agents were conclusively unknowing and oblivious of the alleged dissipation of Parmalat corporate assets. There are factu-

---

[10] Discovery had closed and trial was imminent.

al disputes that swirl around this controversy; thus, a trial on Bondi's grievances regarding insider pillage and plunder is required."

On appeal, Bondi argues that Judge Harris misapprehended New Jersey law. Relying on *NCP Litigation Trust v. KPMG LLP*, 187 *N.J.* 353, 901 *A.*2d 871 (2006) (*NCP I* ), Bondi argues that no short term devices to keep an insolvent business afloat can ever be considered a benefit to the corporation. He also contends that the *in pari delicto* doctrine is designed to apportion damages among wrongdoers, not to bar a cause of action, and the jury verdict rejecting his remaining claim cannot render dismissal of the non-looting claims harmless error. Moreover, by limiting the aiding and abetting claim to larceny by corporate insiders,[11] Bondi argues the judge crippled his chance to recoup damages from Citi in the face of overwhelming evidence that Citi aided and abetted false financial reporting by corrupt insiders. Citi responds that Judge Harris correctly applied the law of imputation and *in pari delicto*, the adverse interest exception does not apply, and none of the authorities advanced by Bondi support his interpretation and application of the law of *in pari delicto*.

The Latin phrase "in pari delicto potior est conditio defendentis," *in pari delicto* for short, refers to the common law maxim that "where the wrong of both parties is equal, the position of the defendant is the stronger." *Stella v. Dean Witter Reynolds, Inc.*, 241 *N.J.Super.* 55, 73, 574 *A.*2d 468 (App.Div.), *certif. denied*, 122 *N.J.* 418, 585 *A.*2d 412 (1990). *See Breen v. Peck*, 28 *N.J.* 351, 368, 146 *A.*2d 665 (1958) (Heher, J., concurring) (holding no contribution among tortfeasors *in pari delicto* ); *Marx v. Jaffe*, 92 *N.J.Super.* 143, 146, 222 *A.*2d 519 (App.Div.) (holding the law does not assist either party to an illegal contract), *certif. denied*, 48 *N.J.* 140, 224 *A.*2d 325 (1966). *See also Official Comm. of*

---

[11] For example, Judge Harris instructed the jury that "there's no claim in this case, I want to make it crystal clear, no claim about did Citi aid and abet in filing false financial statements. That's not the claim. The claim is limited solely to the issue of did Citi aid and abet looting, stealing money."

*Unsecured Creditors v. R.F. Lafferty & Co.*, 267 *F*.3d 340, 354 (3d Cir.2001) (interpreting *in pari delicto* under Pennsylvania law to mean "that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim"). The refusal to indulge disputes between wrongdoers is based on the policy that denying relief to such parties will deter wrongdoing generally. *McAdam v. Dean Witter Reynolds, Inc.*, 896 *F*.2d 750, 756 (3d Cir.1990). *See also Stella, supra*, 241 *N.J.Super.* at 71–75, 574 *A*.2d 468. Under New Jersey law, the party invoking the defense must establish that the party against whom the defense is asserted must have "substantially equal responsibility for the underlying illegality" to permit dismissal of claims asserted by the aggrieved party. *McAdam, supra*, 896 *F*.2d at 757. *See Pendleton v. Gondolf*, 85 *N.J. Eq.* 308, 313–14, 96 *A.* 47 (Ch.1915). In the corporate context, a manager's misconduct is usually imputed to the corporation. *Wight v. BankAmerica Corp.*, 219 *F*.3d 79, 86 (2d Cir.2000).

An acknowledged exception to the imputation or *in pari delicto* doctrine is the adverse interest exception. *CBI Holding Co. v. Ernst & Young*, 529 *F*.3d 432, 448 (2d Cir.2008), *cert. denied,* —— *U.S.* ——, 129 *S.Ct.* 1998, 173 *L.Ed*.2d 1086 (2009); *In re Phar–Mor, Inc. Sec. Litig.*, 900 *F.Supp.* 784, 786 (W.D.Pa.1995); *In re Crazy Eddie Sec. Litig.*, 802 *F.Supp.* 804 (E.D.N.Y.1992). Under this exception, the wrongs of an insider will not be imputed to the corporation, if the insider acted solely for his own benefit and adverse to the interest of the corporation. *CBI Holding, supra,* 529 *F*.3d at 448. *See also Crazy Eddie, supra,* 802 *F.Supp.* at 817. The standard governing invocation of this exception is total abandonment. *CBI Holding, supra,* 529 *F*.3d at 448. Therefore, the inquiry focuses on whether the misdeeds of the corporate insiders worked to the benefit or detriment of the corporation. *Phar–Mor, supra,* 900 *F.Supp.* at 786. This inquiry, in turn, delves into considerations of whether any short term or transient benefit to the corporation can be considered a benefit to the corporation, *see id.* at 787 (suggesting that creation of false

financial statements facilitating aggressive expansion is purposeful action antithetical to the best interests of the corporation), and whether any transient benefit to the corporation is inconsistent with the total abandonment by the management team of their responsibilities and duties to the corporation, *Crazy Eddie, supra,* 802 *F.Supp.* at 818. It is also generally acknowledged that this is a fact-sensitive inquiry that may defeat a motion for summary judgment. *Phar–Mor, supra,* 900 *F.Supp.* at 786; *Crazy Eddie, supra,* 802 *F.Supp.* at 818.[12]

In his ruling, Judge Harris focused on the five key transactions which Bondi alleged Citi improperly facilitated: the acquisition of Canadian dairy businesses and the creation of Parmalat Canada in 1997, the tax-structured financings with Parmalat subsidiary Geslat in 1995 and 1999, the securitization of Parmalat accounts receivable, the 2003 sale and leaseback of milk production facilities in New York and New Jersey, and derivative transactions over a twenty-three month period between 2001 and 2003. The judge referred to undisputed evidence and admissions by Bondi that multiple high-ranking officers and directors, including the CEO and CFO, had deliberately misrepresented the firm's financial condition over a protracted period of time as they misappropriated billions for their own purposes. Bondi acknowledged that the misappropriation and financial manipulations that permitted the theft of corporate assets commenced prior to the commencement of the business relationship. Bondi also acknowledged that during the same period of time thousands of Parmalat employees and vendors throughout the world prospered.

In light of these concessions, in order to prevail on this appeal, Bondi must establish as a matter of law that the fraudulent actions

---

[12] Another exception, the innocent decision-maker exception, has been roundly discredited as resting on a single instance of doctrinal error and inconsistent with the basic principles of agency law underpinning imputation of agent wrongdoing. Jonathan Witmer–Rich and Mark Hermann, *Corporate Complicity Claims: Why There is No Innocent Decision-maker Exception to Imputing an Officer's Wrongdoing to a Bankrupt Corporation,* 74 *Tenn. L.Rev.* 47, 50 (2006).

of the corporate insiders constituted a total abandonment of their corporate responsibilities. In addition, this court must find as a matter of law that no benefit accrued to the corporation through any of the five highlighted transactions or that any benefit was so transitory as to be illusory. Finally, if a benefit accrued to the corporation, this court must find that the Parmalat insiders and Citi bear substantially equal responsibility for the underlying illegality. Bondi argues that *NCP I* clearly and unequivocally supports his position that the five transactions facilitated by Citi cannot be considered a benefit to the corporation as a matter of law. We disagree.

As noted in *McAdam,* the defense has been the subject of little recent discussion. 896 *F.*2d at 757. *NCP I,* on which Bondi principally relies, is the Supreme Court's most recent discussion of the issue; however, it is not a definitive treatment of the issue.

In *NCP I,* the Court permitted a shareholder trust to pursue negligence claims against an accounting firm retained by the corporation as its independent auditor. 187 *N.J.* at 358, 901 *A.*2d 871. The Court did so in the context of a direct undertaking by the auditor to provide audit services to the corporation, where some of the services were calculated to detect fraud. *Id.* at 384, 901 *A.*2d 871. Under these circumstances, the Court held that the wrongs of corporate officers would not be imputed to the shareholder trust. *Ibid.* Interestingly, the Court also recognized that the facts before it were not "typical" with respect to invocation of the imputation defense:

> However, this matter does not present the typical circumstance for which the imputation defense was designed because PCN's [the bankrupt company, the shareholders of which were now represented by the plaintiff trust] agents did not directly defraud an innocent third party. They defrauded the corporation and its creditors instead. In that respect, KPMG [the auditor] is not a victim of the fraud in need of protection. Further, KPMG had an independent contractual obligation, at a level defined by its agreement with PCN, to detect the fraud, which it allegedly failed to do. Allowing KPMG to avoid liability for its allegedly negligent conduct would not promote the purpose of the imputation doctrine—to protect the innocent.

[*Id.* at 372, 901 *A.*2d 871.]

Nevertheless, the Court also emphasized that it was rendering its decision within the context of a procedural posture which included "pleadings [that] do not support the availability of the imputation defense in this appeal," and at an "early stage" prior to completion of discovery, where the auditor could conceivably still establish that no rational factfinder could find its audits were prepared negligently. *Id.* at 384–85, 901 *A.*2d 871. Finally, Justice Zazzali, writing for the Court, took issue with the dissent's prediction that the decision, as a practical matter, signaled the demise of the imputation defense and proceeded to clarify its ruling by stating "the imputation defense [still] exists to protect innocent third parties from being sued by corporations whose agents have engaged in malfeasant behavior against those third parties." *Id.* at 371, 901 *A.*2d 871.

It is in the *NCP I* atypical context that we must view also two comments made by the Court. The Court seems to make a sweeping ruling that no benefit can ever accrue to a corporation by borrowing practices that only postpone insolvency and an inevitable bankruptcy proceeding. *Id.* at 381, 901 *A.*2d 871. Yet, the Court also recognized that it was addressing this issue in the context of a motion to dismiss and allowed that a full record might reveal that the actions of the corporate wrongdoers did confer a benefit on the corporation. *Id.* at 381–82, 901 *A.*2d 871. The Court's suggestion that a full record may reveal a factual issue to be tried is in accordance with other authority on the issue. *See Phar–Mor, supra,* 900 *F.Supp.* at 786; *Crazy Eddie, supra,* 802 *F.Supp.* at 818. Of course, development of a full record may also permit disposition of the issue by summary judgment.

Moreover, having acknowledged the possibility that some benefit may have accrued to the corporation due to the defalcations of corporate officers, who were also shareholders, the Court had to address the implication of this possibility due to the status of the plaintiff as a shareholder trust and the accepted rule that corporate wrongdoers should not participate in any recovery. It is in this context that the Court states that "imputation may be assert-

ed against those shareholders who engaged in the fraud," *NCP I*, 187 *N.J.* at 378, 901 *A.*2d 871, and "any benefit would not be a complete bar to liability but only a factor in apportioning damages," *id.* at 382, 901 *A.*2d 871. We, therefore, do not subscribe to Bondi's position that the *in pari delicto* rule in this State operates only as an apportionment of damages rule rather than as a bar to a claim or series of claims. The discussion in *NCP I* must be considered in the atypical context in which the rule arose in that case. The limitations of the decision also require us to refer to other authorities to determine whether the known defalcations by the Parmalat insiders could as a matter of law confer a benefit on the corporation and thus eliminate resort to the adverse interest exception.

Admittedly, in many cases, insider looting that leads to insolvency cannot be deemed a benefit to the company. *See, e.g., Schacht v. Brown*, 711 *F.*2d 1343, 1348 (7th Cir.) (finding that "the prolonged artificial insolvency" of the company benefited "only [the company's] managers and the other alleged conspirators, not the corporation"), *cert. denied*, 464 *U.S.* 1002, 104 *S.Ct.* 508, 78 *L.Ed.*2d 698 (1983). And sometimes the issue presents a question of fact. *See Allard v. Arthur Andersen & Co.*, 924 *F.Supp.* 488, 494 (S.D.N.Y.1996) (infusion of capital in exchange for corporate indebtedness may not actually benefit the company because it may merely "lull[ ] shareholders into postponing" dissolution); *Crazy Eddie, supra*, 802 *F.Supp.* at 818 (embezzled money partly fed back into company to help inflate public image was not inconsistent with management's abandonment of corporation, and created question of fact). *See also NCP Litig. Trust v. KPMG*, 399 *N.J.Super.* 606, 622, 945 *A.*2d 132 (Law Div.2007) (*NCP II* ) (on remand following *NCP I*, trial court notes that pending discovery it would not presume that the "fraudulent inducement" of corporate survival was a per se benefit or per se harm to the company).

But in other cases, the mere fact that insider fraud results in bankrupting the corporation should not dictate a conclusion that along the way the company or its shareholders did not receive

substantial benefits, even if only enjoyed for a finite period pending the bankruptcy, and so the imputation principle should still apply. *See In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 891–92 (Del.Ch.2009) (refusing to bar the *in pari delicto* defense where corporate actors were at least partly motivated by disloyalty in trying to "increase the corporation's actual or reported profitability," because to create such an exception "would give corporations a gaping exception from the in pari delicto doctrine, putting them on a different plane from actual human beings"). To bar the *in pari delicto* defense when a company the size and extent of Parmalat is subjected to long-term insider self-dealing, some of which predated the formation of the Parmalat–Citi banking relationship, would be inequitable even when the company ends in insolvency. And, in fact, one district court decision involving Parmalat holds exactly as such.

In *In re Parmalat Securities Litigation,* 383 *F.Supp.*2d 587, 589–90 (S.D.N.Y.2005) (*Parmalat I* ), one of the several related cases filed by Bondi, Bondi sued the bank and its affiliates, charging that the defendants had structured transactions among Parmalat and related entities to help management defraud the company and its investors. Bank of America raised the *in pari delicto* defense, but the court initially found that the defense was not applicable at the motion-to-dismiss stage, "to the extent that the complaint alleges that [the bank] assisted the insiders in stealing from Parmalat. . . ." *Id.* at 593, 595, 599. In so ruling, however, it also noted that, "[b]y any standard, theft from a corporation by insiders is self dealing by the insiders and not in any sense in the interest of the entity." *Id.* at 599.

Bondi also filed a complaint against the Parmalat accountants, Grant Thornton, seeking similar damages under similar claims. *In re Parmalat Sec. Litig.,* 659 *F.Supp.*2d 504, 512 (S.D.N.Y.2009) (*Parmalat II* ).[13] Following numerous procedural developments

---

[13] The Second Circuit recently partially affirmed and remanded portions of both decisions. The court held that federal jurisdiction existed but remanded to

in the several actions, Bank of America renewed its assertion of *in pari delicto*, which the court again denied, but in so doing nonetheless added how it "remain[ed] to be seen whether Bondi can prove that transactions that raised millions of dollars for Parmalat served no corporate purpose." *Ibid.*

Subsequently, both Bank of America and Grant Thornton reasserted the *in pari delicto* defense as ground for summary judgment. *Id.* at 516. In analyzing whether the insiders' fraud should be imputed to Parmalat at that stage, the court noted that an agent's fraud committed "within the scope of" employment is always imputed to the corporation. *Id.* at 517–18. It also noted there was no question that Parmalat insiders had engaged in "massive fraud that ended in the collapse of Parmalat." *Id.* at 518. The court also found that preparing and approving even fraudulent financial reports, statements and disclosures were all done within the scope of the insiders' employment. *Ibid.*

Next, addressing the imputation of the wrongful conduct to the corporation for purposes of the *in pari delicto* defense, the court recognized that a principal would "suffer[ ] imputation as long as the agent in some respect served the principal. . . ." *Id.* at 519. Stated differently, imputation applied unless "the agent totally abandoned the principal's interests." *Ibid.* (footnote omitted). The rule reflected the policy decision "that it would be undesirable to permit principals to avoid responsibility for an agent's actions or knowledge whenever an agent could be said to have acted even in part for the agent's own interest notwithstanding that the agent simultaneously served the interests of the principal." *Id.* at 519–20.

In repeating its conclusion that insider theft is always against corporate interest, the court observed that the *in pari delicto* defense would thus not be available to the defendants to the extent to which they, too, were "culpable participants in the theft

---

the district court to consider whether abstention was mandatory. *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 *F*.3d 572, 576 (2d Cir.2011).

of corporate assets...." *Id.* at 520. Nevertheless, the court realized that it was not dealing with allegations that the bank or the accountant had harmed Parmalat by stealing directly, but it was dealing with claims that, as in this case, the defendants had helped insiders to artificially inflate assets and use "sham entities and transactions" to facilitate looting and conceal squandering. *Ibid.* Rejecting Bondi's contention that, in the face of such huge-scale fraud, the question of whether the agents had "totally abandoned" the company must be measured "by looking at the long term effects on the corporation of the agents' acts" or at their intent, the court described why it was unreasonable for Bondi to claim that the resultant insolvency necessarily meant the acts of the self-serving insiders had not benefited the company:

> The preparation and certification of financial statements and advising Parmalat with respect to structuring financing vehicles and moving or keeping debt off consolidated balance sheets were corporate activities. Indeed, they assisted Parmalat in obtaining over $14 billion in capital, much of which Parmalat invested to expand its production facilities from three to 130, its workforce from 1,217 to 36,356 employees, its product line to 10,000 items, and its international presence from five countries to thirty. Even assuming that individual agents stole some of the money, Parmalat's officers and employees manifestly were engaged in conducting the work of Parmalat, growing and expanding the business, when they engaged in all of the activities alleged in the complaint save theft from Parmalat.
> [*Id.* at 520.]

Thus, Bondi "simply cannot get around the fact that Parmalat, by means of the transactions complained of, raised and spent millions of euros for corporate purposes," and that "[t]he actions of its agents in so doing were in furtherance of the company's interests" notwithstanding that some of the agents intended to steal the additional money raised by the ongoing fraud. *Id.* at 521. In the final analysis, "[t]he acts and knowledge of those corporate agents who effected [the transactions complained about] are the responsibility of the corporations." *Id.* at 523. The court, therefore, permitted the defendants to raise the *in pari delicto* defense, and granted them summary judgment. *Id.* at 524–25.

We consider Bondi's reliance on several federal decisions misplaced. In *Thabault v. Chait*, 541 *F.*3d 512, 529 (3d Cir.2008), applying New Jersey law, the court concluded that because the

president had allowed his insurance company to continue past the point of insolvency, his actions could not be construed as having benefited the company for purposes of the imputation defense. In *Thabault*, however, three years elapsed between the initial detection by examiners of an underwriting loss and when the State sought a liquidation order. During this time, the president had agreed to stop accepting new contracts for insurance, but thereafter failed to honor his agreement. *Id.* at 516–17. In other words, throughout that period the president did nothing to preserve the company and breached his promise to take specific actions to ameliorate the known financial difficulties. In that context, nothing suggests that during the period at issue the company benefited from the extension and intensification of corporate exposure and liability. Here, however, the period of fraud extended for almost two decades, during which the company substantially grew and expanded before becoming insolvent. Particular circumstances may justify imputation and, in this case, the record supported the trial court's decision to impute. *See NCP II, supra,* 399 *N.J.Super.* at 622, 945 *A.*2d 132 (prior to discovery's completion, court would not presume that fraud leading to a company's insolvency was either a harm or a benefit).

In *CBI Holding, supra,* the court determined that the "most important piece of record evidence" to support the bankruptcy court's conclusion to disallow imputation was that the " 'real reason' " for the particular fraud at issue was to maximize the bonuses of a single officer, who was also the company president and chairman. 529 *F.*3d at 439, 449. While the court acknowledged that the fraud itself occurred during a two-year period and took many forms including the delay of recording invoices, the creation of false inventory, and the creation of " 'paper' " inventory transfers between subsidiaries, the record nevertheless supported the conclusion that the sole purpose of the fraud was to enrich the chairman. *Id.* at 440. Under these circumstances, any benefit received by the corporation was "illusory." *Id.* at 453. Moreover, its decision ultimately rested on the bankruptcy court's evidential findings that " 'the segment of management involved in the fraud

was acting for its own interest and not that of' " the company, labeling such findings "not clearly erroneous." *Ibid.* (quoting *In re CBI Holding Co.*, 247 *B.R.* 341, 365 (Bankr.S.D.N.Y.2000)). The fraud in *CBI Holding,* involving artificially inflating a bonus for a single officer during a two-year period, easily distinguishes it from this case, both in terms of duration of the fraud and the number of agents who directly profited.

Viewing the record in the light most favorable to Bondi, the evidence overwhelmingly supports his contention that the insiders' greed ultimately drove Parmalat to bankruptcy, but the proofs are far less definitive on the actual extent to which the company and any innocent shareholders did not profit from the agents' wrongdoing. In fact, the circumstances suggest that the opposite is true, and that the company did receive meaningful gains over a protracted period.

For example, regardless of the fraud implicit in the financial statements filed between 1994 and 2002, Parmalat grew from having fifty-four plants in eleven countries and 7,000 employees in 1992, to over 139 plants in thirty countries with more than 36,300 employees in 2002. In Italy alone, Parmalat's market share for pasteurized milk products increased more than six fold during that same period. Parmalat also made important strides in milk production technology, permitting expansion of its product line.

Moreover, CFO Tonna said that prior to 1994 Parmalat was still an averaged-sized company. He testified, without contradiction, that acquisition was the means by which to compete globally with big multi-national corporations. According to him, Parmalat's acquisitions between 1993 and 2001 involved approximately € 4 billion. He maintained that, even as late as 1997, "all the loans received" by the company were used to make such acquisitions, "to sustain the business, ... to finance working capital, and finance capital investments to improve production." Granted, Tonna's claim concerning the use of the loans was arguably made to justify the fraud, but this particular statement was made in January 2004 after the fraud was known and, in any event, the

fact remains that Bondi failed to establish how, for six or seven years before bankruptcy, the borrowed funds were not being used at least in part for the purposes Tonna listed and therefore to the benefit of the company.

There are other examples of corporate benefits to Parmalat during the period of the fraud. For example, evidently by 1996, even after Citi had invested in Geslat in 1995, the Parmalat "group" was issuing a sort of "profit sharing." Or, at points when Parmalat evidently had a negative net worth, the company still maintained "cash flow generation capabilities" better than many other companies. Similarly unrebutted was Tanzi's assertion that "at the beginning of the 90's," when Chase was the corporation's "only debtor bank," Parmalat acquired the Farmland company, which "helped us become . . . a leader in the New York market."

In a similar vein, Joseph Anatasi, forensic accountant presented by Bondi, opined that while Tanzi and other high officials caused € 85 million to be distributed in Parmalat dividends between 1998 and 2003, only about € 43 million was attributed to Tanzi himself. Granted, if accurate, the sum paid to Tanzi, even as a 51% shareholder, is staggering. However, Tanzi's portion nonetheless does not account for the equally huge amount that was presumably received or enjoyed by other shareholders, or used in ways to continue or grow Parmalat's operation for their common benefit. Bondi also neglects to address the presumably huge competitive advantage Parmalat's investors, employees and vendors enjoyed during the period when the company was expanding and manifesting tangible successes even while the insiders were looting the corporate funds.

Similarly, the record did not provide sufficient evidence to create a material fact issue that the thirty-one corrupt insiders totally abandoned Parmalat when they undertook the various fraudulent acts admitted by Bondi over thirteen or fourteen years. The evidence upon which Bondi relies to invoke the adverse interest exception addresses only the question of insolvency, not shareholders' benefits during the interim.

We must also recall that the party invoking the defense and the party against whom the defense is asserted must have "substantially equal responsibility for the underlying illegality" to permit dismissal of claims asserted by an aggrieved party. *McAdam, supra,* 896 *F*.2d at 757. In *McAdam,* Judge Cowen explained why a client of a rogue broker could not be considered substantially equal in responsibility for the fraud conceived by the broker and the losses incurred by the client:

> [t]he fact that McAdam engaged in off-the-book transactions with [the broker]—as did many other defrauded investors—wrote sizable checks made payable to [the broker], and under [the broker's] advice, kept secret what McAdam believed to be a preferred customer account that was not open to the public, does not amount to willful, voluntary involvement in an *illegal* enterprise. There is no evidence that [the broker] confided in McAdam and thus that McAdam knew of [the broker's] fraudulent scheme when he "invested" his money. Foolish credulity is not equivalent to culpability for purposes of the *in pari delicto* defense, *see e.g., [Schoharie County Cooperative Dairies, Inc. v.] Eisenstein,* 22 *N.J.Super.* [503], 514 [92 *A.*2d 390 (App.Div.1952)]], and neither is simple greed or a desire to make money. [*Id.* at 757–58.]

Although certain red flags associated with the five Citi transactions were sufficient to permit the aiding and abetting theft of corporate funds claim to be submitted to a jury, the motion record did not permit a finding or even an inference that any, some, or all of the five identified transactions were illegal on their face. For example, the structure of the Parmalat Canada transaction, the put, and the terms of the put were fully disclosed to investors. Securitization of accounts receivable is an acceptable and widely used tool to enhance cash flow of a corporation. Derivatives may be risky, little understood, and complex devices, but they are also widely-used in the financial world. Moreover, Judge Harris effectively preserved Bondi's right to pursue damages against Citi for those losses stemming from aiding and abetting the insiders' looting, which were clearly acts so far removed from the corporate interest that the defense should not apply to them.

To the extent that Bondi complains that the court's ruling on *in pari delicto* compromised his ability to establish the insider looting, he is mistaken. Bondi tried the case primarily by linking the various fraudulent activities, including falsification of financial

records, and the insider looting. For example, Bondi presented Anatasi, who described the interrelationship between "falsifying records" and insider looting. In his closing argument, counsel for Bondi asserted that Citi's "scheme" consisted of a "continuous series of transactions" where it knew Parmalat was concealing losses through debt but not acknowledging them as such. In fact, in denying Bondi's post-trial motions, Judge Harris commented that, if anything, its evidentiary decisions had erred in Bondi's favor "to foster a very generous and indulgent environment to the Plaintiff to prove an awful lot that maybe the [j]ury shouldn't have heard." The record supports that conclusion.

### III

Bondi contends that Judge Harris erred in dismissing his deepening insolvency cause of action (Count VIII). We need not address this issue due to our affirmance of the summary judgment in favor of Citi on its *in pari delicto* defense, but do so for the sake of completeness.

■ Bondi asserts that New Jersey law recognizes a cause of action for activities that cause deepening insolvency of a corporation, as well as the apportionment of damages to the extent the actions of corporate insiders permitted any insolvency to deepen. Moreover, he contends that there is no conflict between Italian and New Jersey law on the issue; therefore, he asserts that Judge Harris erred when he held that a conflict of law existed, Italian law should apply, and that under Italian law Bondi lacked standing to pursue such damages.

Citi responds that Bondi is estopped from raising this claim on appeal because he does not reference the February 2005 order in his notice of appeal. We disagree. In his April 2008 opinion addressing the cross-motions for summary judgment, Judge Harris treated the issue of deepening insolvency as a measure of damages, and Bondi specifically references the April 2008 order in his notice of appeal. We consider the issue preserved for appeal.

Judge Harris addressed the conflict of law issue in accordance with New Jersey law. First, he determined whether an actual conflict existed. *Veazey v. Doremus*, 103 *N.J.* 244, 248, 510 *A.*2d 1187 (1986). When he determined that an actual conflict existed, he identified the governmental policies supporting the respective jurisdictions' laws and how those policies are affected by each jurisdiction's contacts to the litigation and the parties. *Ibid.*

The choice of law issue implicates a legal decision that we review de novo. *Arias v. Figueroa*, 395 *N.J.Super.* 623, 627, 930 *A.*2d 472 (App.Div.), *certif. denied*, 193 *N.J.* 223, 936 *A.*2d 969 (2007). Notably, Bondi does not challenge Judge Harris's determination that Italian interests predominate over those of this State. Rather, he contests Judge Harris's interpretation of Italian law on the issue of Bondi's standing. We discern no error.

Contrary to Bondi's attempt to characterize this litigation as an effort to protect and further the interests of creditors, Bondi has at all times represented the interests of Parmalat, not its creditors. Indeed, in the Italian bankruptcy proceedings, Bondi and the corporate creditors were adversaries. Furthermore, Judge Harris correctly relied on Section 2043 of the Italian civil code to limit damages caused by fraudulent acts to creditors. In *Fallimento Casillo Grani S.N.C. v. Banca Antoniana Popolare Veneta S.C.A.R.L., Cass.*, 28 marzo 2006, n. 7030(It.),[14] the Italian trustees

14 Counsel for Bondi and Parmalat have cited numerous Italian cases for our consideration. In evaluating the weight to be accorded these authorities, a basic understanding of the Italian court system is helpful. Italy has a unified national court system. Ottavio Campanella, *The Italian Legal Profession*, 19 *J. Legal Prof.* 59, 75 (1995). It is divided into two basic categories: ordinary courts and special courts. *Id.* at 75–76. Ordinary courts hear all criminal actions and almost all civil actions between private citizens. *Ibid.* The ordinary courts are composed of the Concilliatori, Pretori, Tribunali, Corte di Appello, Corte d'Assise, Corte d'Assise de Appello, and the Corte Suprema di Cassazione. *Ibid.* The Concilliatori is the lowest level ordinary court, *ibid.*, whereas the Corte Suprema di Cassazione is the highest appellate court in Italy, *id.* at 79. The highest appellate court reviews only questions of law. *Ibid.* Interestingly, the purpose of the Corte Suprema di Cassazione is to ensure unity and uniformity of national law, but its decisions are not binding outside the case in which it is rendered.

sued a bank for having made loans to the insolvent corporation that created an impression that the company was economically viable. *Id.* at 2. Italy's highest court rejected the trustee's claim because the trustee did not have "a power of representation with respect to all creditors, on an indistinct and generalized basis." *Id.* at 5. Moreover, the trustee's predecessor, the company claimant, participated in the transactions that resulted in the abusive lending. *Ibid.*

By contrast, the authorities cited by Bondi, such as *T.M. v. A.G.*, Cass., 2 luglio 2007, n. 14961(It.), are distinguishable, or rendered by a lower court, *see Cirio Finanziaria v. Cragnotti*, Trib., 5 febbraio 2008, n. 33751(It.), or redacted and distinguishable, *see Fallimento P.A. v. B. Antonio*, Trib., 2 settembre 2008(It.). In *Fallimento*, the court permitted a bankruptcy trustee to pursue deepening insolvency claims on behalf of the company against a bank and its employee after both had been convicted of fraudulent bankruptcy [15] and the trustee's lawsuit was tantamount to an indemnification action in which the conviction was res judicata against the employee and the bank. In short, we discern no error.

## IV

Bondi argues that Citi's counterclaims are barred by this State's res judicata principles. Bondi asserts that Citi filed various claims in the Italian bankruptcy proceeding that were predicated on the same transactions underlying its counterclaims, and Citi simply "dressed up its Italian claims in the garb of 'new' tort causes of action." The claims which Bondi contends are barred by res

*Ibid.* On the other hand, its decisions are considered as persuasive authority. *Ibid.*

[15] The Italian bankruptcy system is historically punitive exposing individuals and corporate officers to criminal liability. Paolo Manganelli, *The Evolution of the Italian and U.S. Bankruptcy Systems—A Comparative Analysis*, 5 *J. Bus. & Tech. L.* 237, 238 (2010).

judicata are as follows: claim 6, which sought approximately € 117 million regarding the Geslat transaction; claim 3052, which sought approximately € 45 million in connection with various derivative transactions; and claim 3054, which sought over € 200 million relating to the securitization program. With regard to Citi's conversion claim, which arises from the securitization of receivables, Bondi argues that Citi's claim for damages should be barred because Citi sought and obtained the exact same quantum of damages in the Italian bankruptcy forum and in its counterclaims.[16]

Citi argues that Italian law governs the res judicata analysis and that Italian courts would have permitted its counterclaims. It also contends that New Jersey law would also permit the counterclaim because the Italian bankruptcy judgment was not final. Moreover, Citi argues its various claims in the Italian bankruptcy proceeding concerned contract-based claims that are substantially different from its tort counterclaims.

Applying New Jersey law, the trial judge denied Bondi's motion for summary judgment and denied his motion to dismiss at the close of Citi's case on this ground. The jury returned verdicts for Citi for $364 million on its fraud and negligence counterclaims and $210 million on the conversion claim. On appeal, Bondi argues the judge erred in denying his April 2008 motion for summary judgment and his motion to dismiss at the close of Citi's case on its counterclaims.

█ Denial of a plaintiff's motion for summary judgment is subject to de novo review. *Spring Creek Holding Co. v. Shinnihon U.S.A. Co.,* 399 *N.J.Super.* 158, 180, 943 *A.*2d 881 (App.Div.), *certif. denied,* 196 *N.J.* 85, 951 *A.*2d 1038 (2008). In making this determination, this court owes no deference to the judge's inter-

---

[16] In the trial court, Bondi asserted that Citi's claim for damages on any receivables collected after Parmalat entered extraordinary administration should be collaterally estopped because the Italian bankruptcy court ruled that Citi could not recover damages accruing post-bankruptcy.

pretation of the law. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

Consideration of Bondi's res judicata argument requires an understanding of Italian bankruptcy proceedings. A recent article emphasizes that it would be a mistake to assume that the Italian bankruptcy system and the United States bankruptcy system are similar in philosophy or procedures. Manganelli, *supra*, 5 *J. Bus. & Tech. L.* at 256. Indeed, the Italian bankruptcy system has historically been a punitive system designed to punish the debtor rather than rehabilitate the debtor or reorganize the bankrupt business. A Judge of the Supreme Court of Cassation remarked at an annual meeting of United States bankruptcy judges that bankruptcy proceedings not governed by the Extraordinary Administration procedure or the Special Extraordinary Administration proceeding of the Marzano Decree focus on payment of financial obligations and liquidation of the insolvent business. Luciano Panzani, Presentation for the 78th Annual Meeting of the National Conference of Bankruptcy Judges, October 10–13, 2004 at 4. He said:

> the main scope of the various insolvency procedures is focused on the protection of the interests of the creditors of the insolvent entrepreneur, pursuant to the principal of economic liability, according to which, the insolvent debtor's assets are liable for the fulfillment of the obligations. Consequently, all the above-mentioned procedures, with some specific exceptions ..., are mainly aimed at the liquidation of the insolvent enterprise and to its elimination from the market.
>
> [*Ibid.*]

Discharge of debts has never been an element of the non-reorganization bankruptcy process. *Ibid.*

Although several reforms have occurred in response to the insolvency of large Italian corporations, including Parmalat, there is no unified Bankruptcy Code as in this country. Manganelli, *supra*, 5 *J. Bus. & Tech. L.* at 237. As noted, until recently, Italian bankruptcy proceedings focused on liquidation and the debtor could be subject to restriction of certain rights and criminal sanctions and liabilities. *Id.* at 238.

The procedure known as Extraordinary Administration, introduced in the late 1970s, focuses on preservation of the assets of the insolvent business and protection of employment. *Id.* at 241. The Marzano Decree, enacted in late 2003 in response to the collapse of Parmalat, introduced a special Extraordinary Administration designed to preserve the debtor's business and to prevent liquidation. *Id.* at 242. Thus, the Extraordinary Administrator may file a reorganization plan and may also propose a composition with creditors. *Id.* at 243. This latter plan is known as a Concordato. *Ibid.* The Marzano Decree procedures represent a significant break from the historically punitive approach to bankruptcy in Italy. *Ibid.*

A declaration of bankruptcy or initiation of an Extraordinary Administration may also trigger criminal proceedings for directors of bankrupt companies. *Id.* at 244. Directors may be held liable for damages caused by their wrongdoing or criminally liable for actions taken while insolvent but before a declaration of bankruptcy. *Ibid.* Authorization of a high-risk transaction during the pre-insolvency period is a bankruptcy crime. *Ibid.* It is also a bankruptcy crime to seek credit or continue to seek credit with the effect of hiding the insolvency of the company. *Ibid.*

Res judicata, or claim preclusion, insulates courts from the inefficiency of relitigating claims that have already been resolved, thereby protecting the integrity of judgments and preventing the harassment of parties. *Velasquez v. Franz*, 123 *N.J.* 498, 505, 589 *A.2d* 143 (1991); *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 124 *N.J.* 398, 409, 591 *A.2d* 592 (1991). To apply the bar, three elements must be met:

(1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.

[*Watkins, supra,* 124 *N.J.* at 412, 591 *A.2d* 592.]

If given preclusive effect, the prior judgment will bar not only the matters actually determined in the previous proceedings, but also all claims that could have been raised in the first action. *Mortga-*

*gelinq Corp. v. Commonwealth Land Title Ins. Co.*, 142 *N.J.* 336, 338, 662 *A.*2d 536 (1995). Conversely, a claim that could not have been presented in the first action, for instance because of the first court's lack of jurisdiction over the claim, will not be barred in the subsequent action. *Watkins, supra,* 124 *N.J.* at 413, 591 *A.*2d 592. The reasoning for this exception is that if the plaintiff could not have asserted the two claims "in a single forum, it would be unfair to force [the plaintiff] to sacrifice the claims that could not be so asserted in order to bring a single action in one forum." *Id.* at 413–14, 591 *A.*2d 592.

▮▮▮▮▮ The related principle of collateral estoppel, or issue preclusion, bars the relitigation of an issue that has already been addressed in a prior matter, if

(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[*First Union Nat'l Bank v. Penn Salem Marina, Inc.*, 190 *N.J.* 342, 352, 921 *A.*2d 417 (2007) (citations omitted).]

The Court has held that "[u]nlike claim preclusion, issue preclusion can result from a judgment even if that judgment was not rendered on the merits." *Watkins, supra,* 124 *N.J.* at 422, 591 *A.*2d 592.

In *Watkins,* the Court held that, generally, the preclusive "effect of a judgment is determined by the law of the jurisdiction that rendered it." *Id.* at 411, 591 *A.*2d 592 (citing *Restatement (Second) of Conflicts of Laws* § 95 comment e (1971)). *Accord Restatement (Second) of Judgments* § 86 (1982) ("A valid and final judgment of a state court has the same effects under the rules of res judicata in a subsequent action in a federal court that the judgment has by the law of the state in which the judgment was rendered...."); *Restatement (Second) of Judgments, supra,* § 87 ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court."). *Watkins,* however,

involved a first judgment issued by a federal court, rather than an international body as here. 124 *N.J.* at 401, 591 *A.*2d 592.

 Slightly different considerations prevail in determining the preclusive impact of international judgments on domestic matters. *See Restatement (Third) of Foreign Relations Law of the United States* § 482(2) (1987) (identifying factors when a court may deny recognition). *See also Innes v. Carrascosa,* 391 *N.J.Super.* 453, 490, 918 *A.*2d 686 (App.Div.) ("foreign judgments should not be given [recognition] where such decisions violate the public policy of this state . . . ."), *certif. denied,* 192 *N.J.* 73, 926 *A.*2d 857 (2007). In this vein, in *Hilton v. Guyot,* 159 *U.S.* 113, 163–64, 16 *S.Ct.* 139, 143, 40 *L.Ed.* 95, 108 (1895), the United States Supreme Court explained that in international relations

> "[c]omity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

Thus, the *Restatement* generally provides that

> [a] valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States *so far as the immediate parties and the underlying cause of action are concerned.*
>
> [*Restatement (Second) of Conflicts of Laws, supra,* § 98 (emphasis added).]

The rationale is that although a foreign nation's judgment is not entitled to the same full faith and credit as a domestic one, a court may, in the interests of finality, accord the judgment the same deference it would confer to a sister state's ruling, as long as certain conditions are satisfied. *Id.* § 98 comment b. Here, the underlying validity of the appointed bankruptcy Judge Guiseppe Coscioni's decisions to admit Citi's claims are not at issue. The dispute instead centers on the degree of recognition, more specifically, the extent to which those determinations should be accorded res judicata effect.

 According to the *Restatement,* this ancillary question is unsettled:

> A foreign nation judgment which meets the conditions specified ... will [generally] be given the same degree of recognition as a sister State judgment ... so far as the immediate parties and the underlying cause of action are concerned. *It is uncertain, however, whether an American court will always give similar effect .. to the foreign rules as to splitting a cause of action or as to collateral estoppel* (compare § 95, Comments e and g).
>
> [*Id.* § 98 comment f.]

*See also* Robert C. Casad, *Symposium: Issue Preclusion and Foreign Country Judgments: Whose Law?*, 70 *Iowa L.Rev.* 53 (1984) (surveying cases addressing which law to apply in determining the preclusive effect of a foreign nation judgment). However, the *Restatement* provides that, "[n]ormally, an American court [will] apply the foreign rules as to these matters if these rules are substantially the same as the rules of the American court." *Restatement (Second) of Conflicts of Laws, supra*, § 98 comment f. The corollary to this principle would therefore be that if there is a substantive conflict in the preclusion laws of the international and domestic courts, the estoppel laws of the latter should generally control.

In this case, Judge Harris did not articulate his reasons for applying New Jersey's preclusion principles; thus, it is unclear whether he found a conflict between Italian and New Jersey law. However, this is of no consequence because, although the parties disagree as to whether Coscioni's decisions have a res judicata effect, the certifications submitted by the parties suggest a uniformity between Italian and New Jersey res judicata laws in terms of the relevant factors to be considered. Moreover, according to the previously referenced *Restatement* provision, New Jersey law would control the analysis even if there was a substantial conflict of laws. *Ibid.*

A. Fraud & Negligent Misrepresentation Counterclaims.

Carlo Felice Giampaolino, a professor of law at the University of Rome, certified on behalf of Citi, and Bondi did not dispute, that under Italian law

> [f]inal judgments bar any judge in charge of a later trial from deciding on the same issues when the later action[:]

[1.] is pending between the same parties, their heirs or their assignees;

[2.] is based on the same cause of

action. . . .

[3.] seeks the same relief. . . .

According to Giampaolino, the elements of this test are similar to New Jersey's factors for claim preclusion, which examine: 1) whether there is a final judgment "on the merits" in the prior action; 2) the identity or privity of the parties; and 3) whether the subsequent claim arises from the "same transaction or occurrence" as the first claim.

Before comparing Citi's Italian claims and current counter-claims, we note that Italian and New Jersey law diverge regarding the finality of a judgment. New Jersey courts hold that a judgment is final even pending an appeal. *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 207 *N.J.Super.* 607, 624, 504 *A.*2d 828 (Law Div.1985). However, Giampaolino certified that

[u]nder Italian law, when a judgment is no longer subject to any means of appeal, it becomes final and binding and constitutes res judicata. After the judgment becomes res judicata, the findings contained therein are conclusive for all purposes vis-à-vis the parties, their heirs and their assignees.

Predictably, this divergence is reflected in the positions of the parties. Citi maintains that the Italian judgments are not final because they may be annulled if the appealing bondholders prevail before the Corte Suprema di Cassazione. Bondi reiterates that under New Jersey law a judgment is final even in the face of an appeal, and claims that Coscioni's decisions are entitled to comity. It is noteworthy, however, that Bondi has not identified, either in the trial court or on appeal, any legal authority to contradict Giampaolino's statement of Italian law.

In any event, a court may, but is not required to, extend comity to a foreign judgment. *Hilton, supra,* 159 *U.S.* at 163–164, 16 *S.Ct.* at 143, 40 *L.Ed.* at 108. As a practical matter, it also is not necessary to resolve the divergence between Italian and New Jersey laws as to when a judgment is deemed final, because as discussed previously, the corollary to the relevant *Restatement* provision suggests that New Jersey law would control under both

circumstances. *Restatement (Second) of Conflicts of Laws, supra,* § 98 comment f. Bondi has not shown that they constitute the same cause of action as the claims asserted in the Italian proceedings.

 Giampaolino certified, and again Bondi did not dispute, that under Italian law

[t]he cause of action ... is the legal ground supporting the claim. Generally, with reference to the rights to a credit, the legal ground of the claim is identified by the material facts. ... For the same fact, *different causes of action based on the same fact[s] are barred only when the decision issued on one cause of action would constitute the remedy also for the violation of the rule which grounds the second cause of action.*

[emphasis added.]

New Jersey's test for determining the sameness of two causes of action largely subsumes the Italian test, and considers

"(1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions) ...; (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first) ...; and (4) whether the material facts alleged are the same."

[*Culver v. Ins. Co. of N. Am.,* 115 *N.J.* 451, 461–62, 559 *A.*2d 400 (1989) (quoting *United States v. Athlone Indus., Inc.,* 746 *F.*2d 977, 984 (3d Cir.1984)).]

*See also First Union, supra,* 190 *N.J.* at 352–53, 921 *A.*2d 417 (applying same test to determine similarity of issues for purposes of issue preclusion). As the moving party, Bondi has failed to establish that he was entitled to relief based on these elements.

As Citi points out and Bondi concedes, the Italian proceedings concerned a different theory of recovery. Citi's bankruptcy claims derived from Parmalat's liabilities under the parties' contractual agreements, but Citi's counterclaims rested on losses it would not have incurred, but for the duplicity of Parmalat's management. Citi's fraud and negligent misrepresentation counterclaims called for additional proofs neither required nor relevant to the Italian matter, thus the underlying "wrongs" in the Italian action and the current matter are distinct. *Cf. Culver, supra,* 115 *N.J.* at 462–63, 559 *A.*2d 400 (res judicata applied even though the first and

second proceeding involved different theories of recovery because the underlying fact inquiries were virtually the same).

Bondi has also failed to show that Coscioni even would have had the authority to hear Citi's tort claims as part of the Italian insolvency proceedings. Res judicata applies not only to matters that were litigated, but to all issues that could have been presented. *Mortgagelinq Corp., supra,* 142 *N.J.* at 338, 662 *A.*2d 536; *Culver, supra,* 115 *N.J.* at 463, 559 *A.*2d 400. Conversely, if "a claim could not have been presented in the first action, then it will not be precluded in a later action." *Watkins, supra,* 124 *N.J.* at 413, 591 *A.*2d 592. We have been provided with no authority to support Bondi's assertion that Citi could have raised their tort claims in the insolvency proceedings.

Moreover, it is difficult to imagine how the summary proceedings described by the parties could have yielded a judgment on the merits of a fraud and negligent misrepresentation claim. *See Perry v. Tuzzio,* 288 *N.J.Super.* 223, 230, 672 *A.*2d 213 (App.Div.1996) (entire controversy doctrine did not bar malpractice action because of the summary nature of the probate proceedings). Res judicata does not apply unless "the party whose claim is being sought to be barred ... had a fair and reasonable opportunity" to fully litigate that claim in the first action. *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 261, 597 *A.*2d 1101 (App.Div. 1991). *See also Thornton v. Potamkin Chevrolet,* 94 *N.J.* 1, 5, 462 *A.*2d 133 (1983) (holding that entire controversy doctrine does not apply where first action occurred in an unequal jurisdiction). The certifications submitted in the trial court suggested that the narrow purpose of the Italian proceedings was to determine which creditors would be permitted to participate in the Concordato, and to facilitate prima facie findings only. To this end, in his decision on claim 6, Coscioni noted that he could not address Bondi's allegations of fraud against Buconero because "the actual economics of the [parties'] relationship requires [sic] an indispensable pretrial investigation, with opposing parties, not capable of being tried in this venue nor in the form of this debate." It is not clear

whether such evidence would have been considered in the event of an appeal, or whether Citi's tort-based claims could have been redressed by a higher Italian court. Bondi, as the moving party, bore the burden to show that Citi had the opportunity to fully litigate its claims in the Italian proceedings but failed to do so.

Bondi's further arguments to the contrary are unpersuasive. He insists that the Italian claims are the "same" as Citi's counterclaims for fraud and negligent misrepresentation because they involve the same essential facts; namely, the parties entered into a contract, Parmalat defaulted, and Citi was damaged. However, this position oversimplifies the scope and complexity of Citi's case, and is belied by the overwhelming size of the trial record. Moreover, Bondi's attempt to bar Citi's fraud and negligent misrepresentation counterclaims on the basis of res judicata is disingenuous to the extent that he has placed the same underlying facts at issue in his own case.

Bondi also argues that any distinctions between Citi's contract-based bankruptcy claims and Citi's tort-based counterclaims are illusory, because the latter seeks "virtually identical" damages as the claims admitted and resolved in the Italian bankruptcy proceedings. But this argument is largely unsupported by the record. Moreover, even if the final recovery amounts are similar, Bondi has not identified any legal authority to support his apparent position that such a coincidence, in and of itself, can form the basis for denying Citi the opportunity to present its case. To the contrary, in *First Union National Bank,* the Court applied principles of issue preclusion to hold that a judgment which awarded damages in a note enforcement action precluded a second judgment which awarded a different amount of damages in a subsequent mortgage foreclosure proceeding, but only "to the extent [that] the note and mortgage provide[d] for the *same categories of damages* . . . ." 190 *N.J.* at 344–45, 921 *A.*2d 417 (emphasis added). Based on the record and Bondi's arguments on this issue, it is not even possible to determine whether and to what extent the Italian

proceedings concerned the same categories of damages raised in Citi's fraud and negligent misrepresentation counterclaims.

### B. Conversion Counterclaim.

We also affirm the trial court's decision to permit Citi's conversion counterclaim. Citi filed claim 3054 in the insolvency proceedings which, like their conversion counterclaim, included allegations explaining generally the nature of the parties' agreement and Parmalat's role as the servicer. Bondi apparently objected to claim 3054, and for reasons that are not evident from the decision itself, Coscioni excluded damages accruing after Parmalat entered extraordinary administration, because "under Italian law[,] claims against a bankrupt estate are cut off on the date on which the estate is declared bankrupt." Yet, at the same time Coscioni indicated that his determination was "a summary examination such as allowed in this phase of trial and without prejudice to further elucidations."

Bondi acknowledges the limited scope of Coscioni's decision, but argues that this should not prevent this court from applying res judicata to bar Citi's conversion claim because "Citi[ ]'s Italian claims sought and obtained recovery for these very same receivables, just under a different legal theory." Bondi appears to rest this argument solely on the fact that the amounts recovered in the insolvency proceeding were similar to, that is, within $2 million of the amount of losses alleged with regard to the securitization program. Citi responds that its claim is not precluded, inasmuch as it never had the opportunity to present the substance of its conversion claim in Italy because of Coscioni's limited admission of claim 3054.

Bondi has failed to show that the Italian proceeding provided Citi "with the same full and fair opportunity to litigate the issues and with the same remedial opportunities as the second forum." *Perry, supra,* 288 *N.J.Super.* at 230, 672 *A.*2d 213. Indeed, Bondi does not even address how this court should interpret Coscioni's statement that his decision was without prejudice. Based on

Coscioni's recognition that the rights of the parties were still undecided at the time of his decision, he presumably did not intend his ruling to have the preclusive effect now advocated by Bondi.

In sum, we affirm the denial of Bondi's motion to dismiss Citi's counterclaims on the basis of res judicata because Bondi failed to demonstrate that Citi's bankruptcy claims were based on the same cause of action and sought the same relief as Citi's counterclaims.

## V

Having determined that res judicata does not bar Citi's counterclaim for conversion, we address Bondi's contention that the trial judge should have granted him judgment as a matter of law on the Citi counterclaim for conversion. We disagree.

Citi asserted that Bondi converted the funds that Parmalat collected under the securitization program. The common law tort of conversion is defined as the " 'intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.' " *Chicago Title Ins. Co. v. Ellis*, 409 *N.J.Super.* 444, 454, 978 *A.2d* 281 (App.Div.) (quoting *Restatement (Second) of Torts* § 222A(1) (1965)), *certif. denied*, 200 *N.J.* 506, 983 *A.2d* 1113 (2009). This tort has evolved to apply to "money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security and it is capable of misuse in a way that would deprive the plaintiff of its benefit." *Cargill Global Trading v. Applied Dev. Co.*, 706 *F.Supp.2d* 563, 578 (D.N.J.2010). To avoid transforming a breach of contract into an act of conversion, this court has held that

"[i]t is essential that the money converted by a tortfeasor must have belonged to the injured party." An action for conversion will not lie in the context of a mere debt ... however. Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor.

[*Advanced Enters. Recycling, Inc. v. Bercaw*, 376 *N.J.Super.* 153, 161, 869 *A.*2d 468 (App.Div.2005) (quoting *Commercial Ins. Co. of Newark v. Apgar*, 111 *N.J.Super.* 108, 115, 267 *A.*2d 559 (Law Div.1970)).]

In addition, the funds must be identifiable, *Chicago Title, supra,* 409 *N.J.Super.* at 455–56, 978 *A.*2d 281, and the injured party must establish that the tortfeasor exercised dominion over its money and repudiated the superior rights of the owner, *Mueller v. Technical Devices Corp.*, 8 *N.J.* 201, 207, 84 *A.*2d 620 (1951). The repudiation must be manifested in the injured party's demand for funds and the tortfeasor's refusal to return the monies sought. *Ibid.* (citing *Farrow v. Ocean Cnty. Trust Co.*, 121 *N.J.L.* 344, 2 *A.*2d 352 (Sup.Ct.1938)). Moreover, the demand must be at a time and place and under circumstances such that the defendant is able to comply and any refusal to comply must be wrongful. *Ibid.* If the defendant attaches a condition or qualification to the demand, the issue is whether the condition or qualification is reasonable. *Id.* at 207–08, 84 *A.*2d 620.

On appeal, Bondi contends he was entitled to judgment as a matter of law because a reasonable jury could not find that the funds allegedly converted before January 4, 2004, were identifiably Citi funds or that Parmalat was required to segregate the funds for Citi.[17] Parmalat had been notified by Citi on December 23, 2003, that it was terminated as the servicer of the securitization plan effective January 4, 2004. Bondi also argues that Citi cannot establish conversion after January 4, 2004, because Italian bankruptcy procedure prevented Parmalat from paying creditors, such as Citi, other than through the established claims process. Thus, Bondi contends Citi cannot establish that Parmalat unreasonably failed to comply with its payment demand.

---

[17] It is not clear whether Bondi appeals from the denial of his motion to dismiss all of Citi's counterclaims, his motion for judgment at the close of Citi's case or his motion for judgment notwithstanding the verdict and a new trial. Whether this issue is governed by *Rule* 4:37–3, *Rule* 4:40–2, or *Rule* 4:49–1, Bondi cannot prevail on this argument.

Citi does not contend that Parmalat was required to segregate the funds it collected as the servicer. It does argue, however, that neither segregation of funds nor unreasonable refusal are required elements of conversion. It further contends that Parmalat's refusal to pay was not reasonable, assuming reasonability of a refusal is an element of the claim.

Our review of the record demonstrates that Bondi cannot reasonably dispute Citi's ownership of the receivables and associated funds. The plain text of the agreements clearly evinces a transfer of title of the receivables from the seller to the purchaser. *See Hirsch v. Phily*, 4 *N.J.* 408, 413, 73 *A.2d* 173 (1950) ("The terms of the assignments furnish the best evidence of the relation between the parties and leave no room for doubt as to the fact that there was a complete and unequivocal assignment of the accounts receivable to the plaintiff."). These documents, as well as the testimony of several trial witnesses, including Bondi's expert, provided sufficient justification to the jury to reject Bondi's theories that the securitization program was a sham and to find that Citi legitimately acquired both the receivables and associated rights to receive payment.[18]

Moreover, the collection arrangement in *Hirsch, supra,* appears to be analogous in some respects to the arrangement in this case. The Court described the relationship as follows:

As checks were received from the customers of [the defendant] in payment of the accounts assigned to the plaintiff, the checks would be noted on a collection report by [the defendant] and both the checks and the collection report would be held for . . ., the plaintiff's agent in charge of [defendant's] account, who would usually call at the [defendant's] office twice a week. [The plaintiff's agent] would examine the checks and the collection report and receive from [the defendant] its check drawn on its general account to the order of the plaintiff for the amount of the promissory note secured by the particular assigned accounts represented by the customers' checks. [The defendant] then deposited the customers' checks in its own account.

18 The unreported case of *Scholes Electric & Communications, Inc. v. Fraser*, No. 04–3898, 2006 *WL* 1644920 (D.N.J. June 14, 2006) does not advance Bondi's claim. In *Scholes*, the relationship between the parties was more akin to a debtor-creditor relationship, and the plaintiff did not have an underlying property right to the allegedly converted funds. *Id.* at 17, 19–20.

[*Id.* at 411, 73 *A*.2d 173.]

The Court in *Hirsch* noted that the parties' agreement left "no room for doubt as to the fact that there was a complete and unequivocal assignment of the accounts receivable to the plaintiff." *Id.* at 413, 73 *A*.2d 173. It found that the validity of the assignment was not impaired by the fact that the defendant acted as the plaintiff's agent for purposes of collecting the receivables, and concluded that the plaintiff could pursue a conversion claim. *Id.* at 414, 73 *A*.2d 173. In so finding, the Court never assessed whether the converted funds were held in a segregated account. *Id.* at 413, 73 *A*.2d 173. The inference to be drawn from the Court's analysis is that the presence or absence of segregated funds is not dispositive when the plaintiff's ownership of the segregated funds is not in question. *See Chicago Title, supra,* 409 *N.J.Super.* at 455–56, 978 *A*.2d 281 ("It is essential that the money have belonged to the injured party and that it be identifiable, but the money need not be the identical bills or coins that belong to the owner."). *Cf. Advanced Enters. Recycling, supra,* 376 *N.J.Super.* at 162, 869 *A*.2d 468 (no conversion existed because "the funds in question were not deposited with" the defendant for the plaintiff's benefit, and the parties had a debtor-creditor relationship).

Bondi's arguments on appeal do not directly challenge the amounts identified by Citi as due and owing, or Citi's rights to the receivables under the 1995 and Italian RPA.[19] Bondi also does not dispute that those same agreements divested Parmalat of any property rights in the receivables. In the face of such facts, Bondi elevates the form of the parties' agreement over its substance by insisting that, because the agreements did not require a segregation of funds, Citi should be barred from seeking recovery of the sums Parmalat collected on behalf of Eureka. *See Chicago Title, supra,* 409 *N.J.Super.* at 456, 978 *A*.2d 281 ("Where a sum of money is identifiable, courts look to the relative rights of each

---

[19] Receivable Purchase Agreement.

party to possession and use of the money to determine whether a cause of action lies for conversion.").

Bondi's final argument, that Italian law prevented him from making payments outside the bankruptcy proceedings, is also without merit. First, it is disingenuous to the extent that it is inconsistent with the essence of his segregation argument. Thus far, his argument has not been that he is willing but unable to return the collected funds to Citi, but rather, that he is unwilling to return the funds to Citi because Citi is not entitled to them. More importantly, Bondi has not identified a clear source of Italian law to support his allegations that Italian law prevented Parmalat from paying Citi what it owed under the securitization program. In fact, as Citi points out and the record shows, Bondi never asserted this purported restriction as a basis for keeping the funds prior to this litigation.

Moreover, even if Italian law precluded the release of funds while Parmalat was in extraordinary administration, it is difficult to imagine why this would extinguish Citi's right to the funds. In short, the facts in this case showed that Bondi collected funds that belonged to Citi and asserted ownership over those funds. "To constitute an act of conversion, '[i]t is sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it. It is the effect of the act which constitutes the conversion.'" *Charles Bloom & Co. v. Echo Jewelers,* 279 *N.J.Super.* 372, 381, 652 *A.*2d 1238 (App.Div.1995) (quoting *McGlynn v. Schultz,* 90 *N.J.Super.* 505, 526, 218 *A.*2d 408 (Ch.Div.1966), *aff'd,* 95 *N.J.Super.* 412, 231 *A.*2d 386 (App.Div.), *certif. denied,* 50 *N.J.* 409, 235 *A.*2d 901 (1967)). *See also Winkler v. Hartford Accident & Indem. Co.,* 66 *N.J.Super.* 22, 29, 168 *A.*2d 418 (App.Div.) ("After an act of conversion has taken place and become complete, even an unconditional offer to return the goods or actual return of the goods does not bar the cause of action, although it may tend to mitigate damages."), *certif. denied,* 34 *N.J.* 581, 170 *A.*2d 544 (1961).

## VI

■ Bondi insists that the judgment should be reduced because Citi lacked standing to assert claims on behalf of its subsidiaries. Of the five defendants, only Citi filed a counterclaim. Bondi argues that the judgment included $207 million in damages for entities that neither had appeared nor had filed counterclaims.

The counterclaims included the Geslat transactions in which Citibank International, Plc., and later Vialattea and Buconero, invested. The transactions were structured to allow Geslat to repay Citi and its subsidiaries from after-tax profits and also gave an actual or potential monetary stake in Geslat. The counterclaim also asserted a conversion claim. Eureka had purchased receivables from Parmalat and Parmalat subsidiaries, but Citi was the operating agent for the transactions. Citi eventually purchased the Parmalat receivables from another Citi subsidiary. Witnesses produced by Citi testified that all Citi entities that did business with Parmalat were Citi subsidiaries, their business appeared on Citi consolidated financial statements, and all profits and losses flowed through Citi books. In short, any losses incurred by even one subsidiary was considered a loss of Citi funds.

■ "A subsidiary corporation is one in which another corporation, a parent corporation, owns a majority of the shares of its stock." 18 *Am.Jur.2d Corporations* § 41 (2004). "Every action may be prosecuted in the name of the real party in interest. . . ." *R.* 4:26–1. "Standing" typically requires a sufficient stake in the litigation's outcome, genuine adverseness to the subject matter, and the substantial likelihood of loss in the event the decision is not favorable. *In re Camden Cnty.*, 170 *N.J.* 439, 449, 790 *A.*2d 158 (2002). But standing "is not automatic, and a litigant usually has no standing to assert the rights of a third party." *In re Six Month Extension of N.J.A.C. 5:91–1 et seq.*, 372 *N.J.Super.* 61, 85, 855 *A.*2d 582 (App.Div.2004), *certif. denied,* 182 *N.J.* 630, 868 *A.*2d 1033 (2005). Generally, however, our State has a "low threshold" for standing. *Id.* at 86. Accordingly, the rules are exercised liberally in order to aid justice and deprecate " 'procedural frustra-

tions.' " *Jen Elec., Inc. v. Cnty. of Essex,* 197 *N.J.* 627, 645, 964 *A.*2d 790 (2009) (citation omitted).

Generally, acknowledged rules governing claims by and against corporate entities support Citi's standing to prosecute the counterclaim. For example, in addressing principles governing the disregard of distinctions between parent and subsidiary in the context of "piercing the corporate veil," the Delaware Supreme Court has said:

> There is, of course, no doubt that upon a proper showing corporate entities as between parent and subsidiary may be disregarded and the ultimate party in interest, the parent, be regarded in law and fact as the sole party in a particular transaction. This, however, may not be done in all cases. It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved.
>
> [*Pauley Petroleum, Inc. v. Cont'l Oil Co.,* 239 *A.*2d 629, 633 (Del.1968).]

*See also In re Teleglobe Comm. Corp.,* 493 *F.*3d 345, 371 (3d Cir.2007) (citing *Pauley* for the proposition that "[i]t is a bedrock principle of corporate law in Delaware and elsewhere that courts must respect entity separateness unless doing so would work inordinate inequity").

These principles are most typically applied in the context of a third-party's attempt to hold the parent liable for the torts of the subsidiary. *See Davis v. Tyee Indus., Inc.,* 58 *Or.App.* 292, 648 *P.*2d 388, 393 (1982) (circumstances justified employee's suit against corporate parent, where the employee worked for the wholly-owned subsidiary but his commission checks were drawn on the parent's account), *aff'd,* 295 *Or.* 467, 668 *P.*2d 1186 (1983). Nevertheless, there is no fundamental reason why such equitable principles should not inform the issue of corporate separateness, regardless of the type of injury alleged and whether it is a third-party or the company parent which seeks to disregard the conclusiveness of a subsidiary's form. *See Pauley, supra,* 239 *A.*2d at 631–33 (court considered, but found no evidence to justify, disregarding the "separate corporate entities" and ordered an injunction against the parent to direct its subsidiary to take certain action). In fact, such a rule is in keeping with the principle that

"no one factor or circumstance is generally conclusive" when it comes to distinguishing "parent corporations and their subsidiaries" in matters of corporate responsibilities. 18 *Am.Jur.2d Corporations, supra,* § 65. It should be no different when considering corporate rights. New Jersey, for example, already recognizes that circumstances may create standing to permit a parent corporation to raise rights under an arbitration agreement signed by its subsidiary and not by the parent. *EPIX Holdings Corp. v. Marsh & McLennan Cos.,* 410 *N.J.Super.* 453, 467–68, 982 *A.*2d 1194 (App.Div.2009).

 The relevant counterclaims in this case were grounded in fraud, misrepresentation and conversion. With respect to the securitization claims, Bondi does not dispute that Citi ultimately purchased the subject receivables. Bondi does not deny that, as a practical matter, Citi personnel were intimately involved with the entire securitization process and transactions. With respect to the Geslat transaction, Bondi acknowledged there was no appreciable distinction among defendants as to which entity was loaning the money or controlling the transactions. Thus, the evidence established that the funds loaned or extended to Parmalat all originated from Citi. In New Jersey, "[a] financial interest in the outcome of litigation is ordinarily sufficient to confer standing." *Assocs. Commercial Corp. v. Langston,* 236 *N.J.Super.* 236, 242, 565 *A.*2d 702 (App.Div.), *certif. denied,* 118 *N.J.* 225, 570 *A.*2d 979 (1989). *See also Marshall v. Raritan Valley Disposal,* 398 *N.J.Super.* 168, 176, 940 *A.*2d 315 (App.Div.2008) (quoting *Assocs. Commercial, supra* ).

## VII

In summary, we affirm the order striking in large measure the *in pari delicto* defense asserted by Citi to defeat the Bondi complaint. We affirm the order dismissing the deepening insolvency cause of action and the separate order barring Bondi from seeking deepening insolvency damages. We further hold that res judicata principles do not bar Citi's counterclaims, Citi had stand-

ing to pursue the conversion counterclaim, and the conversion counterclaim was not barred as a matter of law.

Affirmed.